## In re BEERMAN.

(District Court, N. D. Georgia, November 29, 1901.)

### No. 663.

BANKRUPTCY—LIEN—VALIDITY OF MORTGAGE.

The agent of a wholesale firm procured a third person to lend a merchant sufficient money to pay a debt he owed the firm, taking a mortgage on the merchant's stock. The lender and borrower were unacquainted, and the lender refused to make the loan unless a member of the firm would give him a bond to indemnify him against loss, which was done. Although there was no specific agreement, the lender understood that the firm was to get the money lent, which it did. The agent testified that he supposed the debtor to be solvent, as he represented himself to be, but he was in fact insolvent, and was adjudged a bankrupt a month later. *Held*, that the effect of the transaction if the mortgage was enforced would be to enable the firm to obtain a preference

indirectly which it could not have obtained if the mortgage had been taken to itself, and that the mortgagee would not be permitted to enforce the mortgage until he had exhausted his remedy on the bond, if at all.

In Bankruptcy. Hearing on report of referee.

C. D. Maddox and E. D. Thomas, for intervener.

J. L. Travis, for bankrupt.

Reynolds & McGill, for trustee.

NEWMAN, District Judge. The report of the referee in this case as to the matter now in hearing is on the intervention filed by F. M. Powers, setting up and asking to have enforced a mortgage for $200 on the stock of goods of the bankrupt. The question is whether or not this mortgage is void under the bankruptcy act. The facts show that the bankrupt, on the 15th day of June, 1901, owed J. J. & J. E. Maddox, wholesale merchants, $192; that at that time the agent of J. J. & J. E. Maddox procured Powers to lend to Beerman, the bankrupt, the sum of $192, taking his note and a mortgage on his stock of goods for $200 to cover the amount loaned and interest; that a check was given by Powers to Beerman for $192, which, on the same date, was indorsed by Beerman to J. J. & J. E. Maddox, and collected by them, which is shown by the check and the indorsements thereon. The evidence on the subject was as follows:

F. M. Powers, the mortgagee and intervener here, testified:

"I lent the money, thinking it was at eight per cent., at the suggestion of Mr. L. B. Jackson, agent for Messrs. J. J. & J. E. Maddox. I did not know Mr. Beerman, nor had never seen him. I had seen his place of business. Do not think I had any conference with Mr. Maddox. A bond was given me to indemnify me against loss by Mr. Maddox. This bond is in evidence. I think the bond and mortgage were all drawn about the same time, possibly not on the same date. I stated to Mr. Jackson that if they would make me perfectly secure I would lend the money for $8.00. This is the first time I have entered into this kind of a transaction. I did not see any member of the firm except Mr. L. B. Jackson. I told him that Mr. Maddox should secure me. Mr. Jackson came to see me, and said: 'I wish you to make this loan, and it is good without any bond. Mr. Beerman is in good shape.' I did not know Mr. Maddox's object. I wished to be secured. I did not rely on Mr. Beerman's solvency,—perhaps partially, but not absolutely. I made no investigation except through Mr. Jackson. I suggested Mr. Maddox giving bond. I did not know absolutely that the money to be loaned was going to pay the debt of J. J. & J. E. Maddox, but I thought so at the time. I told Mr. Jackson to give me a bond, and I would loan the money. Mr. Jackson manifested much interest in the matter. I never spoke a single word to Mr. Beerman, nor did I rely on Mr. Beerman's solvency. I requested that a bond was to be given me before I saw Mr. Beerman. I know of Mr. Jackson's connection with J. J. & J. E. Maddox. I know that J. J. & J. E. Maddox got the money that I loaned Mr. Beerman. I had no agreement as to where the money was to go. I believe I knew where it was going from the special interest taken in the loan by Mr. Jackson. He manifested considerable interest in cutting down the interest I was to charge. Mr. Jackson had never before made any point on the interest that I charged. I knew the bond was good. I would not have loaned the money without the bond at that rate of interest. I might have loaned it without the bond at big interest. I put one note in the bank, and it was returned unpaid. I was absent from the city when Mr. Beerman went into bankruptcy. I got a letter from Mr. Thomas that the note had been returned unpaid by the bank. I would not have loaned Mr. Beerman money had I known he was

going into bankruptcy. Mr. Beerman did not turn over the check for the money—$192.00—in my office. I handed the check to Mr. Beerman, and he went out of the office with Mr. Jackson. I knew that Mr. Beerman owed J. J. & J. E. Maddox $192.00, and I supposed that they would get the money on account of their giving bond to indemnify me against loss. I did not calculate the per cent. at the time. I thought I was charging eight per cent. but I see now that I was charging 12 per cent. I had information that McCord, Stewart & Co. had obtained a mortgage was the reason that I put the mortgage on record. It appears that they did not have any mortgage, and my information was untrue."

### G. C. Beerman testified:

"I got the money in a check for $192.00. I did not get $200.00. I suppose I was paying $8.00 for interest. I turned over the check in the presence of Mr. Powers, in his office, to Mr. Jackson. Mr. Jackson says to me, 'Maddox will send you a receipt the next day.' Mr. Jackson came down to my store on Courtland street, and told me, 'I know where you can get the money if you will pay us up our debt.' Mr. Maddox promised to let me have more goods, but since the mortgage he only let me have one bill for $23.10. I had never seen Mr. Powers before I went to his office. He has never been in my store, nor did he ask me any questions as to my solvency, and I did not tell Mr. Powers that I was solvent. I knew when I was getting the money that it was to go to Mr. Maddox. I agreed to pay it over before I borrowed it. The understanding was that they were to extend future credit. I did not tell Mr. Powers anything at the time as to my solvency. Mr. Powers did not ask me. I did not say that I would pay the notes. Mr. Powers did not agree to advance me any future credit at that time. I am positive, and swear, that I did not tell him I was solvent, or would meet the notes. I gave the check right away to Mr. Jackson, in Mr. Powers' office, right in the presence of Mr. Powers. Mr. Powers said he would not record the mortgage. After I gave this mortgage, other creditors—McCord, Stewart & Co. and others—began to press me for payment. J. J. & J. E. Maddox refused to extend any further credit. McCord, Stewart & Co. went back on me, and I was forced to go into bankruptcy. I paid all I could, and as far as I could. After I borrowed the $192.00, my stock remained about the same, and was not increased any."

### L. B. Jackson testified:

"I went to Beerman's store and asked him as to his financial condition. He said his liabilities were less than $500.00; business in good shape. We needed the money, and there was necessity to have a loan extended to Beerman in order that he might pay us up. Beerman said he was solvent, and placed his liabilities at less than $500.00. Mr. Powers was not interested in Mr. Maddox. The money belonged to Mr. Powers, and I did not tell him what was to be done with the money. I simply wished to assist in saving Mr. Beerman's credit. In my presence Mr. Beerman told Mr. Powers he was solvent, and could meet the payments easily. Powers said, 'If your condition is satisfactory, I will not record the mortgage.' J. E. Maddox signed the bond because he thought it was safe to do so, and furnished another bill of goods. Beerman did not come to the office, and would not pay the bill. The check given to Beerman by Powers was not turned over in Powers' office, but in Mr. Alexander's office. Mr. Beerman indorsed the check over to me, Jackson. He went through a door first. There was no understanding between Maddox and Powers. Beerman owed us bills past due, and my firm needed the money. It is possible that the firm of J. J. & J. E. Maddox might have taken promissory notes, and indorsed them, and got the money. I don't know as to what they might or could do. Beerman consented to pay us that way. Alexander had nothing to do with the check. Yes, the rooms connect. Went straight in Alexander's office, and there the check was indorsed over to the firm of J. J. & J. E. Maddox. Powers asked for the bond, and I went to J. E. Maddox, and he said he would do it. Since the fire the firm have needed money, and we were hastening collections all we could."

A voluntary petition in bankruptcy was filed by Beerman on July 13, 1901, just one month after this occurrence. It seems clear that the transaction worked a preference to J. J. & J. E. Maddox. Mr. Powers, the mortgagee, seems to have understood perfectly well that this money was to go to J. J. & J. E. Maddox. While it is not so clear that he knew of Beerman's insolvency, it certainly seems that he had reasonable cause to believe that he was at least in very doubtful condition as to solvency. If Beerman was in fairly good condition, there was no reason whatever why the agent for the Maddox firm should have sought to obtain the payment of their debt in this peculiar way. Mr. Powers, as a money lender, and as an intelligent man, must have observed all this. If transactions of this sort are to be permitted, then, instead of a creditor taking a mortgage himself, when a debtor is in failing circumstances, he will get some one else to advance the money, agreeing that the person advancing the money shall suffer no loss, and thereby obtain by indirection a preference which he would be unable to get if he had acted directly with the debtor, provided, of course, that the debtor within four months thereafter becomes a bankrupt.

The matter will be referred back to the referee, with instructions to take such further action as is in accordance with the views herein expressed.