AMERICAN BANK OF ALASKA v. JOHNSON.

(Circuit Court of Appeals, Ninth Circuit. October 1, 1917.)

No. 2815.

1. BANKRUPTCY ⬤⟲303(3)—TRANSFERS—KNOWLEDGE OF TRANSFEREE—EVIDENCE.

In a suit by the trustee of bankrupts, composing a mining copartnership, to recover the value of gold dust delivered by the bankrupts to defendant bank, evidence *held* to show that the dust was sold to the bank in the ordinary course of business, that its value was at once ascertained and credited by tellers' slips to the account of the bankrupts, who were doing business as a partnership, and at once offset against their notes and debts, and that the bank had no knowledge at that time that the firm was insolvent, or that an unlawful preference would be given.

2. BANKRUPTCY ⬤⟲164—PREFERENCES—DEPOSITS—EFFECT OF.

The deposit of gold dust in a bank to the account of the depositor is not a transfer of money as a payment or security, and does not operate to diminish the estate of the depositor.

3. BANKRUPTCY ⬤⟲326—PREFERENCES—WHAT CONSTITUTE.

Where a depositor, who was indebted to a bank, make a deposit in the usual course of business, the bank's application of the amount of the de-

---

⬤⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

posit to its indebtedness is valid as a set-off, under Bankruptcy Act July 1, 1898, c. 541, § 68a, 30 Stat. 565 (Comp. St. 1916, § 9652), and is not a preference under section 60a (section 9644).

**4. BANKRUPTCY ⊚⇒326—DEPOSIT AND CREDIT—CHARACTER OF TRANSACTION.**
That the books of a bank did not show the entry of credit until the day after a deposit of gold dust does not change the character of the transaction, where at the time of the delivery of the dust to the bank credit was actually given by tellers' slips.

In Error to the District Court of the United States for the Fourth Division of the Territory of Alaska; Charles E. Bunnell, Judge.

Action by G. Johnson, as trustee in bankruptcy of T. Mitchell & Co., a mining copartnership consisting of Thomas Mitchell, Jas. J. Fallon, and Herman Fawcett, bankrupts, against the American Bank of Alaska, a corporation. There was a judgment for plaintiff, and defendant brings error. Reversed and remanded, with directions.

Action by Johnson, as trustee in bankruptcy of the mining partnership of T. Mitchell & Co., of Fairbanks, Alaska, against the American Bank of Alaska, at Fairbanks, to recover $3,750.27, with interest, upon the theory that the action of the bank with respect to certain gold dust, of the value of $3,750.27, delivered to the bank on the evening of July 31, 1913, constituted an unlawful preference, and was voidable under section 60 of the Bankruptcy Act. The case was tried to a jury, and general verdict for the trustee was rendered. Judgment in accord with the general verdict was entered, and the bank sued out writ of error.

Thomas A. McGowan, John A. Clark, and John Knox Brown, all of Fairbanks, Alaska, and Charles J. Heggerty and Knight & Heggerty, all of San Francisco, Cal., for plaintiff in error.

Herman Weinberger, of San Francisco, Cal., and Louis K. Pratt and Thomas A. Marquam, both of Fairbanks, Alaska, for defendant in error.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge (after stating the facts as above). There is little conflict in the testimony, and the facts are substantially as follows: Mitchell & Co., a partnership, consisting of Thomas Mitchell, J. J. Fallon, and H. Fawcett, had an account with the bank for some weeks before July 31, 1913. By June 9, 1913, the firm owed about $1,500, besides a debt of about $400 to the bank. The first clean-up, on July 3, 1913, amounted to $1,904. This was turned into the bank, where the overdraft was then $1,400, and was credited to the firm. Checks were drawn against it, and again overdraft was made. The second clean-up, on July 16th, realized $2,280, and was also put in the bank to the credit of the firm, and checks were honored. The third clean-up was on July 30th, and was made subsequent to a telephone message from Brunning, cashier of the bank, advising the firm that it had no money and that notes and overdrafts were due, and that he (Brunning) had deposited his note for $500 to meet checks to reduce the overdraft. On the evening of July 31st, about 5 o'clock, after regular banking hours, Fallon, who had charge of the books and accounts,

went to the bank with gold dust worth $3,750.14. The firm then owed over $13,000, of which it owed the bank, on notes and overdraft $4,-096.14; the debt being for labor account checks, merchandise, and other things paid for by the bank between July 16th and 31st.

Fallon, in testifying as to the occurrences in the bank, said that he and Fawcett went to the bank about 5 o'clock and left the firm bank book and the gold dust, which was "to be blown and credited the same as before"; that he went back in the evening, between 7 and 8 o'clock, and was told that the dust was not cleaned up, whereupon he said he would call in the morning; that the next morning, when he called, Mr. Brunning gave him the bank book and vouchers, and told him that he had been instructed to get all overdrafts in, and said, "I have applied it and disbursed it," and that the bank could not carry the firm any longer. Fallon also said that the book was returned on August 2d, and showed that on July 31st $3,750.27 was placed to the credit of the firm; that on August 2d the books and vouchers returned showed that the bank had paid checks for $6,329.70 since the previous balance, and that it had credited the firm account with the last clean-up, and charged against the account the notes the firm had in the bank, and that there was still an overdraft of $133.70. The books of the bank, offered in evidence, showed deposits of proceeds of gold dust and check withdrawals and overdrafts. A deposit of $2,213.14 was made on July 18th; one of $500 on July 19th to reduce overdraft; one on July 31st of $3,750.27; while on July 16th overdraft was $133.71; on August 2d checks amounting to $6,329.70 were returned. Petition in involuntary bankruptcy was filed August 23, 1913.

The evidence showed that between June 11, 1913, when the firm commenced to do business with the bank, and July 31, 1913, the bank honored the checks of the firm and paid out for them $9,683.35, and received and credited gold dust from them amounting to $7,934. On the evening of July 31st a garnishment was levied upon the bank in an action brought by certain creditors against the firm, but these proceedings were all subsequent to the delivery of the gold dust to the bank. Brunning, the cashier, testified that the credit of the proceeds of the dust was made July 31st; that the books were balanced as on that day and that a deposit slip, which was introduced in evidence, showing the advance of $3,734.12 was made that day, but that the entries in the individual ledger carrying the credit and showing the charges were not made by the bookkeeper until August 1st and 2d; that, in accordance with the usual custom of the bank, the notes were treated as a check would be, and were charged up and the overdraft extinguished as far as could be, and that in this way he made the set-off then and there; that all was done before 6 o'clock, and that he did not then know anything of impending suits against the firm, or that its prospects were bad. The cashier explained an entry of $19.13 on August 2d as the difference between what the dust brought at $16.40 and what it realized after the assay; the purchase having been made at the rate of $16.-40 an ounce, with the understanding that if it "went better" the firm would get the credit, but that if it did not go $16.40 the bank would sustain the loss.

[1] Without statement of more of the evidence, we think it clearly shows that the gold dust was sold to the bank on July 31st in due and customary course of business; that the value was at once ascertained and credited by teller's slips, July 31st, to the account of firm, and at once offset against the notes and debts of the firm to the bank; that the bank acted in good faith, and had no knowledge, when it received the gold dust and credited the firm account, that the firm was insolvent, or that any unlawful preference would be given to the bank. The law which must control can be briefly stated:

[2, 3] The deposit of the proceeds of the gold dust to the credit of the firm in the bank did not operate to diminish the estate of the mining firm. The deposit was not a transfer of money as a payment or security. New York County National Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380; Continental Trust Co. v. Chicago Title Co., 229 U. S. 435, 33 Sup. Ct. 829, 57 L. Ed. 1268. The transaction established the relationship of debtor and creditor. There having been a general deposit in course of business when the credit was made, the bank had a right to set off the notes and to dismiss the overdraft. Cumberland Glass Co. v. De Witt, 237 U. S. 447, 35 Sup. Ct. 636, 59 L. Ed. 1042; In re Wright-Dana Hardware Co., 212 Fed. 397, 129 C. C. A. 73.

[4] The fact that the books of the bank do not show the entry of the credit until August 1st does not change the character of the transaction, for the time the dust was delivered to the bank and credit therefor was actually given by the slips is the time when the deposit was made. 3 Ruling Case Law, 531; Wasson v. Lamb, 120 Ind. 514, 22 N. E. 729, 6 L. R. A. 191, 16 Am. St. Rep. 342. One bit of evidence which strongly upholds the statement of the bank cashier as to the time when the credit was given is the testimony of Mr. Pratt, counsel for the creditors, who levied the writ of garnishment already referred to, who says that on the same evening that the attachment papers were issued he called up the officials of the bank and asked them what his clients "caught" by the garnishment, and was told nothing was attached, as the firm was heavily in debt to the bank, which had "just credited that clean-up," and that the firm still owed the bank. There is no showing of fraud in the transaction. The bank had paid checks for the half month preceding July 31st, when the firm was owing the bank a considerable amount, and, although the officers were solicitous about the account, they had no reasonable ground to believe that the condition of the firm was desperate, or that it would not be able to go on with its mining.

Counsel for the firm rely upon Mechanics' & Metals National Bank v. Ernst, 231 U. S. 60, 34 Sup. Ct. 22, 58 L. Ed. 121. But in the Ernst Case the deposits were not received in the usual course of business, and were really intended to be payments to give a preference. German-American State Bank v. Larimer, 235 Fed. 501, 149 C. C. A. 47. In Fourth National Bank v. Smith, 240 Fed. 19, —— C. C. A. ——, the Court of Appeals of the Eighth Circuit, reviewing the more recent decisions by the Supreme Court, holds, as is undoubtedly the law, that, if a bank to which a depositor owes money had knowledge of the depositor's insolvency, but, prior to bankruptcy proceedings, sets off

against the debt of the depositor the amount of the deposits made by the depositor in the usual course of business, the transaction is valid as a set-off under section 68a of the Bankruptcy Act, and is not a preference under section 60a of the Bankruptcy Act, inasmuch as the making of the deposit merely creates a relation of debtor and creditor between the bank and the depositor, and the application of the deposits to the indebtedness involves no transfer of the property.

It follows, from what we have said, that upon the established facts the court should have granted the motion for a verdict in favor of the bank. The judgment will be reversed, and the cause remanded, with directions to enter a judgment for the defendant notwithstanding the verdict.