### LOWELL et al. v. MERCHANTS' NAT. BANK OF MANCHESTER, N. H.

#### In re PONZI.

(District Court, D. New Hampshire. August 11, 1922.)

#### No. 111.

1. **Bankruptcy ⬅163—Depositing money subject to check not a "preference."**
   The deposit of money in a bank to his own credit subject to check by
   an insolvent within four months of bankruptcy was not a preference,
   within Bankruptcy Act, § 60a (Comp. St. § 9644).

   [Ed. Note.—For other definitions, see Words and Phrases, First and
   Second Series, Preference.]

2. **Banks and banking ⬅140(1)—Bank not bound to question legitimacy of de-
   positor's disbursements.**
   The only duty of a bank receiving money on general deposit was to
   pay it out under depositor's orders, and it was not bound to question the
   legitimacy of his disbursements.

3. **Bankruptcy ⬅185—Bank not liable for paying checks constituting preferen-
   tial payments, in absence of fraud or collusion.**
   In the absence of active fraud or collusion, on the part of a bank pay-
   ing checks or vouchers of a bankrupt while insolvent, with those receiv-
   ing the claimed preferential payments, the bank was not liable to refund
   the money to the bankrupt's trustee.

4. **Bankruptcy ⬅303(1)—No recovery against bank, unless vouchers paid by it
   were paid to preferred creditors.**
   For trustees in bankruptcy to recover from a bank the amounts paid
   by it on the bankrupt's checks and vouchers while insolvent, it must first
   be shown that the persons receiving the payments thereby became pre-
   ferred creditors, and the burden of proof in this respect was on the trus-
   tees.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

**5. Bankruptcy ⬤⟶185—Bank, making payments to persons defrauded by bankrupt, held not liable, though it aided and participated in their retaking of their money.**

If persons, in whose favor a bank paid a bankrupt's checks and vouchers while he was insolvent, thereby merely regained possession of money obtained from them by the bankrupt by fraud, the bank was not liable to the bankrupt's trustees, even though it actively participated and aided them in retaking the money justly belonging to them.

**6. Banks and banking ⬤⟶140(5)—Bank may decline to pay check exceeding amount of deposit.**

A bank was legally justified in not paying checks exceeding the amount to the depositor's credit, and had a legal right to decline to pay the amount on deposit as a partial payment on the checks.

In Equity. Suit by James A. Lowell and others, trustees in bankruptcy of Charles Ponzi, against the Merchants' National Bank of Manchester, N. H. Bill dismissed.

Hugh D. McLellan, of Boston, Mass., for complainants.
Hughes & Doe, of Dover, N. H., for defendant.

MORRIS, District Judge. This is a suit in equity, brought to recover an alleged preference.

The plaintiffs are trustees by appointment of the United States District Court, District of Massachusetts, dated December 8, 1920, of the estate of one Charles Ponzi, of Lexington, county of Suffolk, commonwealth of Massachusetts, a bankrupt.

The defendant is a national bank incorporated under the laws of the United States of America, located in Manchester, in the state of New Hampshire.

The plaintiffs base their right of recovery upon three grounds, as follows:

(1) That the defendant is liable as having participated in a voidable preference to the extent of $197,905.25.

(2) That the defendant is liable as having participated in a transfer in fraud of creditors to the extent of $197,905.25.

(3) That the defendant is liable as having paid from the account standing in the name of Securities Exchange Company, the title under which Charles Ponzi did business, the sum of approximately $73,000, after the authority to make such payments, originally given by Ponzi, had been withdrawn.

### Facts.

From the evidence introduced in this action it appears that one Charles Ponzi, in December 1919, started in business under the name of Securities Exchange Company. His business consisted of selling his personal notes, by the terms of which he promised to pay in 90 days 50 per cent. more than the amount invested, but as a matter of practice he almost invariably paid the full amount, with 50 per cent. added, in 45 days.

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

His explanation of his ability to pay such an enormous rate, of interest was that he was dealing in international reply coupons and foreign exchange of some kind, which was exceedingly profitable, and that therefore he was able to pay his customers the large rate of interest which his notes bore.

Beginning in a small way in December, 1919, with a capital of about $150, through successful advertising, his business grew rapidly until near the close of July, 1920.

The total amount of notes issued by Ponzi during his entire career, December 20, 1919, to July 26, 1920, on the basis of investment value, was $9,582,591.82.

It does not appear that Ponzi was actually engaged in any business other than the sale of his own notes. He depended upon receipts from later investors to pay the notes and accrued interest of earlier investors. He had agents located in different cities, to whom he paid commissions ranging from 10 to 15 per cent. on all money collected for him. In addition to the commissions paid his agents, he had other expenses for the maintenance of his office, clerical force, and advertising which were of no small proportion. He made no investments of any considerable amount. The entire course of his business transactions consisted in taking in money and issuing his notes therefor, depositing the money in some bank, and paying it out to earlier investors when their notes matured. It is therefore apparent that, from the time he began to do business up to the time that he was adjudged a bankrupt, October 25, 1920, he was insolvent, and becoming more so with every note that he issued; and I so find.

One Joseph Bruno was Ponzi's agent in the city of Manchester, N. H., and on April 26, 1920, he opened an account in the defendant bank in the name of "Securities Exchange Company." Shortly after the account was opened the bank, through its cashier, learned that the Securities Exchange Company was not a corporation, but a name under which Charles Ponzi as an individual was doing business. Ponzi's first appearance at the bank of the defendant was on June 24, 1920. At that time he had a conversation with Mr. Additon, defendant's cashier, in which he said that he was able to pay 50 per cent. profit in 45 days owing to his extensive connections in Europe, and that he was dealing in international reply coupons and foreign exchange. This information was conveyed by Mr. Additon to the president of the bank and to the directors. While at the bank Ponzi asked for a blank check, and filled it out on the Hanover Trust Company, Boston, for $100,000, payable to the Merchants' National Bank. I do not find that this deposit was made as a result of any request of the bank. It was made by Ponzi for the purpose of impressing the bank with his great wealth, as on the same day he filled out another check for the sum of $250 as a present to the help in the bank, writing across it, "For the help of the bank, with the compliments of Charles Ponzi." I am of the opinion, and find, that this display of wealth in the presence of the bank officials was a part of Ponzi's advertising scheme. As a further inducement to the people of Manchester and vicinity to invest their

money with him, Ponzi either personally or through his agent informed the bank that he wished to keep enough money on deposit so that any persons dissatisfied with their investments could come to the defendant bank at any time and receive their money back. I find as a fact that there was an understanding between Ponzi, the defendant bank, and Joseph Bruno that Ponzi should maintain a large deposit in the defendant bank, and enough to satisfy the claims of Manchester investors whose notes matured and any who were dissatisfied with their investment and wanted their money returned. It is not probable, however, that the question of returning money to dissatisfied investors received serious consideration until about July 26, 1920.

On the morning of July 2, the account of the Securities Exchange Company in the defendant bank showed a balance of $191,870.90. On that day Mr. Additon, the cashier of the bank, Mr. Bruno, with Mr. Wyman, counsel for Mr. Bruno, went to Boston, and Mr. Additon secured from Mr. Ponzi three $50,000 checks ($150,000) for deposit in the defendant bank. I find that this money was secured from Ponzi in keeping with the understanding above mentioned. It was the desire of the bank and Mr. Bruno, and of Mr. Bruno's counsel, Mr. Wyman, that Ponzi should keep a deposit in Manchester substantially large enough to fulfill the terms of the understanding between them. This was considered good judgment on the part of Ponzi and his agent, Bruno, as an advertisement of their business. The bank was anxious to secure all the deposits that it could, and its cashier, Mr. Additon, also had the desire to safeguard the interests of Manchester investors; but I am unable to find that the bank as an institution considered the money deposited by Ponzi charged with any trust in favor of Manchester depositors. I find that the deposit was a general deposit, subject to checks drawn in Boston by any one of three individuals, Charles Ponzi, Lucy Meli, or Louis Cassullo, in favor of any individual or institution in Manchester or elsewhere. This finding is based on the evidence that checks were so honored by the defendant bank, drawn in favor of persons or institutions other than Manchester investors. This is noticeably the case with reference to $200,000 withdrawn July 28, 1920, $100,000 withdrawn August 4, 1920, and $50,000 withdrawn August 5, 1920; this being a critical period in Ponzi's career, when the bank, if such a binding agreement existed, might well have refused payment on these three checks in the interest of Manchester investors. That it did not do so is strong evidence that it treated Ponzi's deposit as a general deposit, not charged with any trust in favor of any class of investors. If the defendant bank had considered that the Ponzi account was charged with a trust in favor of Manchester investors, to carry out its agreement, it was bound to refuse payment on the above-mentioned checks, calling for large sums which were withdrawn from Manchester and deposited in the Hanover Trust Company in Boston.

On July 26 it became known to the bank, through newspaper reports and in other ways, that Ponzi's business affairs were under investigation in Boston, and that he had agreed to stop taking money

from new investors until the investigation was closed. Word was also received that a "run" was being made on his Boston office in Boston by his investors. This came to the notice of Mr. Bruno and Mr. Wyman, and Mr. Wyman, acting as counsel for Mr. Bruno and having in mind the interests of Manchester investors, called up Miss Meli, Mr. Ponzi's secretary, and inquired about the situation. Mr. Ponzi had stated that all investors who were dissatisfied with their investment could present their notes and receive back the money invested, without interest. Mr. Wyman asked Miss Meli concerning this point, and was informed by her that all such claims would be paid upon presentation at the Boston office. Mr. Wyman objected that this would hardly be satisfactory to Manchester investors, and that it would result in much uneasiness in Manchester. That evening Mr. Wyman and Mr. Bruno, acting on their own behalf, and Mr. Additon, representing the bank, went to Boston and met Ponzi at his home in Lexington. While there they were assured by him that everything was all right; that everybody could have their money back if they were dissatisfied; and this statement was backed up by a very large display of wealth on the part of Ponzi, consisting of certificates of deposit in various banks aggregating over $1,500,000, $200,000 or $300,000 in bills of large denomination, about $200,000 of stock in the Hanover Trust Company and other trust companies, and a large quantity of Liberty bonds. While at his home they discussed the general condition of his affairs with Ponzi and his local attorney, and particularly the Manchester situation. They were assured that his finances were all right and that he was solvent. I find that Mr. Additon, who was acting for the bank, was convinced by this display of wealth that Ponzi's statement that he was able to pay everybody who wanted his money back was true. Before leaving they obtained an order from him, of which the following is a copy:

"July 26, 1920.

"To the Merchants' Nat. Bank, Manchester, New Hampshire:

"Please pay and charge to the account of the Securities Exchange Company in the Merchants' National Bank of Manchester, New Hampshire, any and all vouchers issued by the Securities Exchange Company of Boston for the amount designated on the back of such vouchers, and only for those bearing the approval of Joseph Bruno, Agent.

"Securities Exchange Co., By Charles Ponzi, Mgr."

It was also arranged that an advertisement should be published in the Manchester papers, which arrangement was carried out. The advertisement was worded as follows:

"Conforming to a personal agreement made between Charles Ponzi, of the Securities Exchange Company, and District Attorney Pelletier of Boston, this branch of the Securities Exchange Company, 51 Hanover Street, will not receive funds for investment until after an official audit is made to determine the solvency of this company and to satisfy the district attorney that our methods of financial operations are thoroughly legitimate.

"Meantime—we will pay all maturing obligations as fast as presented.

"Further during the audit of the books any persons holding unmatured notes can receive back their original investment, without interest, if they desire.

"Joseph Bruno, Agent, Room 1, 51 Hanover Street, Manchester, N. H."

On August 2 one William McMasters, who had been employed as publicity man for Ponzi, published an article in the Boston Post, which came to the attention of the bank officials, declaring that Ponzi was hopelessly insolvent and that he had sent no money to Europe, nor had he received any money from Europe recently. No one, after reading this article, following, as it did, numerous articles in the "Boston News Bureau" and other publications, could say that they did not have reason to believe that Ponzi was insolvent, and I find that the defendant bank, on August 2, 1920, and thereafter, had reasonable cause to believe that Ponzi was insolvent.

The fact that Mr. Additon had made frequent inquiries about Ponzi's business, and whether it was possible for him to make such enormous profits by dealing in international reply coupons and foreign exchange, and the fact that at all times he carried such a large deposit in the defendant bank without withdrawing and investing same, must have created a suspicion in the minds of the bank officials that Ponzi's business was not entirely legitimate. But I cannot find that they really knew, or had reasonable cause to know, that his business was not legitimate and that he was insolvent prior to August 2.

They apparently maintained their faith in him until nearly the close of his career. At the close of business on July 26 the account of the Securities Exchange Company in the defendant bank showed a balance of $616,682.71. On July 27 there was deposited in the defendant bank to the account of the Securities Exchange Company $49,763, and there was withdrawn the same day the sum of $16,018.74, so at the close of the bank day the balance of the Securities Exchange Company was $650,426.97. Only one deposit on this account was made thereafter, and that was $700 deposited July 28.

While in Boston with Ponzi July 26, a blank form of approval, to be executed by the investors and Joseph Bruno, was formulated, and later a rubber stamp was made for Bruno's use. The following is a copy of the form used:

"————, 1920.

"In consideration of a payment to me of principal sum I invested on this instrument before date of maturity hereof, which I now accept, I release and fully discharge the obligor herein ————. [Seal.]

"This voucher is offered for the payment of the sum of ——— dollars, in consideration of foregoing release. ———, Agent."

After July 27, all investors who expressed a desire to receive their money back, without interest, presented their note or notes to Mr. Bruno, and had them stamped on the back and approved by him for the face value of the note. Notes so stamped and approved were presented to the defendant bank and paid, without checks being drawn therefor by the Boston office.

In the tabulation which follows, payments made on the order of Bruno are marked "vouchers." Checks drawn by Ponzi's Boston office are marked "checks."

283 F.—9

July 26, 1920.  Amount on deposit at close of business............$616,682.71
July 27, 1920.  Deposits .......................................   49,763.00

                                                                 $666,445.71
  ”    ”    ”    Withdrawal checks...............................  16,018.74

  ”    ”    ”    Amount on deposit at close of business...........$650,426.97
July 28,    ”    Deposit .......................................      700.00

                                                                 $651,126.97
  ”    ”    ”    Withdrawal checks..................$  4,852.54
  ”    ”    ”    Vouchers .....................   18,422.00       23,274.54

                                                                 $627,852.43
July 29,    ”    Withdrawal checks................$209,075.00
  ”    ”    ”    Vouchers ....................     4,950.00      214,025.00

  ”    ”    ”    Amount of deposit at close of business...........$413,827.43
July 30,    ”    Withdrawal checks..................$  3,881.52
  ”    ”    ”    Vouchers ....................     4,000.00        7,881.52

  ”    ”    ”    Amount on deposit at close of business...........$405,945.91
July 31,    ”    Withdrawal checks..................$ 12,060.00
  ”    ”    ”    Vouchers .....................      200.00       12,260.00

  ”    ”    ”    Amount on deposit at close of business...........$393,685.91
Aug.  2,    ”    Withdrawal checks..................$ 13,010.00
  ”    ”    ”    Vouchers ....................        40.00       13,050.00

  ”    ”    ”    Amount on deposit at close of business...........$380,635.91
Aug.  3,    ”    Withdrawal checks..................$  3,357.29
  ”    ”    ”    Vouchers ....................     1,850.00        5,207.29

  ”    ”    ”    Amount on deposit at close of business...........$375,428.62
Aug.  4,    ”    Withdrawal checks..................$101,455.00
  ”    ”    ”    Vouchers ....................     4,400.00      105,855.00

  ”    ”    ”    Amount on deposit at close of business...........$269,573.62
Aug.  5,    ”    Withdrawal checks..................$100,027.25
  ”    ”    ”    Vouchers ....................    94,950.00      194,977.25

  ”    ”    ”    Amount on deposit at close of business...........$ 74,596.37
Aug.  6,    ”    Withdrawal checks..................$  2,159.52
  ”    ”    ”    Vouchers ....................    48,563.25       50,712.77

  ”    ”    ”    Amount on deposit at close of business..........  $ 23,883.60
Aug.  7,    ”    Withdrawal checks..................$    165.00
  ”    ”    ”    Vouchers ....................    11,050.00       11,215.00

  ”    ”    ”    Amount on deposit at close of business...........$ 12,668.60
Aug.  9,    ” ·  Withdrawal checks..................$  3,030.00
  ”    ”    ”    Vouchers ....................     9,490.00       12,520.00

  ”    ”    ”    Amount remaining in bank......................$    148.60

I find that between July 27 and August 9, inclusive, the defendant bank paid out $197,905.25 on vouchers or orders signed by Mr. Bruno. During the same period of time I find that the defendant bank paid on checks drawn in Ponzi's Boston office the sum of $469,091.86. Of this last amount, $150,000 was drawn to the order of the Securities Exchange Company and deposited in the Hanover Trust Company in

Boston. I find that on August 2, and thereafter, the defendant bank paid Ponzi investors, on orders of Bruno, the sum of $170,333.25. During the period between July 27 and August 9, when the defendant bank was paying out money on the Bruno orders, the bank sent to Ponzi's office in Boston a statement of the amount of vouchers paid at the close of each day's business except August 2 and 3; the statements for those dates being included in a letter of August 4.

At the opening of business on August 6, 1920, a check for $150,000, payable to the order of the Securities Exchange Company and deposited in the Hanover Trust Company, was presented to the defendant bank for payment through the Federal Reserve Bank. This check was signed by Miss Meli, secretary. Later in the day another check was presented to the defendant bank by special messenger from the Hanover Trust Company for the sum of $200,000. At the close of business August 5 there was on deposit to the account of the Securities Exchange Company in the defendant bank $74,596.37. Both of the above-mentioned checks were protested for lack of funds. On August 6, 1920, another check for $75,000, signed by Charles Ponzi, payable to the Hanover Trust Company, was drawn and presented to the defendant bank on August 7. This was also protested. On August 7 the account of the Securities Exchange Company in the defendant bank had been reduced to $23,883.60. The "run" on Ponzi's place of business in Boston was continuing, and it is evident that Ponzi was making an effort to call in money from outside banks for deposit in the Hanover Trust Company to meet the demands of Boston investors, and there is no doubt but that, if the money on deposit in the Manchester Bank had been sent to Boston, it would have been paid out to other investors of Ponzi of precisely the same class as the Manchester investors, as was done with approximately all of the $150,000 withdrawn July 29 and August 2. Up to the time the bankruptcy petition was filed against him, August 9, 1920, Ponzi appears to have treated all of his creditors alike, in Boston, Manchester, and elsewhere. So far as appears, he paid all maturing obligations and extended notice, by publishing interviews and advertisements, both in Boston and Manchester, that he would return the amount of their investment to all dissatisfied investors. In this respect Manchester investors were treated no differently from others, except as to the method and place of obtaining their money. Whether Manchester investors who secured the return of their money did so because of the advertisement, or because of the fact that they had been defrauded, does not appear, as no one who invested through Bruno's agency was called to testify. The fact that Ponzi gave the order of July 26, authorizing the bank to pay investors on Bruno's order, made it more convenient for dissatisfied investors around Manchester to secure the return of their money than if they had been obliged to go to Boston for it; but it was no more convenient for them than it was for investors in and about Boston to go to Ponzi's Boston office. The defendant bank had no means of knowing whether the vouchers presented for payment were in favor of individuals investing through Bruno's agency, or some other agency, except what it

might assume from the fact that the notes presented bore Bruno's stamp. As to the $469,091.86 paid on checks drawn in the Boston office between July 27 and August 9, it had no means of knowing whether the payees resided in Manchester or elsewhere, unless the individuals were known to the officials of the bank. In at least one case Bruno indorsed the payments of notes amounting to $15,000 for an individual who invested through the Boston office. Whether there were other similar cases is not disclosed by the evidence. I find that the defendant bank paid all checks and vouchers presented, when there were sufficient funds to the credit of the Securities Exchange Company, without distinction and without inquiry as to the residence of the payee, and that it is not guilty of any fraud or collusion with reference to such payments.

It is claimed by the plaintiffs that the three overdraft checks presented for payment, one for $150,000 August 6, one for $200,000 August 6 (sent by messenger), and one for $75,000 August 7, all of which were protested, operated as a revocation of the order of July 26, and that the subsequent payment of $74,596.37 by the bank was unauthorized. I find that the three checks were drawn, payable to the Tremont Trust Company, Boston, in a hasty effort to meet the urgent demands created by the "run" on Ponzi's place of business in Boston. I find in them no indication that it was Ponzi's purpose to revoke the order of July 26, and I find that it was not revoked.

The $74,596.37 on deposit when the first check was protested was disposed of as follows:

| | |
|---|---:|
| Checks drawn on Boston, paid by bank | $ 5,354.52 |
| Vouchers signed by Bruno, paid by bank | 69,093.25 |
| Remaining in bank | 148.60 |
| | $74,596.37 |

At no time during the four months prior to August 9, 1920, the date when the bankruptcy petition was filed, was the defendant bank a creditor of Ponzi.

### Rulings of Law.

The plaintiffs claim that the bank is liable for the sum of $197,905.25, which it had on deposit July 26, 1920, and which it disbursed on vouchers or orders signed by Ponzi's agent, Bruno. The money was received by the bank and credited to the Securities Exchange Company in a general deposit, subject to the order of the depositor.

[1] Depositing money in a bank to his own credit by an insolvent within four months of his bankruptcy, subject to check, does not constitute a preference, within the meaning of section 60a of the Bankruptcy Act.[1] New York County National Bank v. Massey, 192 U. S. 138, 147, 24 Sup. Ct. 199, 48 L. Ed. 380; In re George M. Hill Co., 130 Fed. 315, 64 C. C. A. 561, 66 L. R. A. 68; American Bank of Alaska v. Johnson, 245 Fed. 312, 315, 157 C. C. A. 504.

In the case first above mentioned it is said:

"As we have seen, a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the

[1] Comp. St. § 9644.

money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. It is not a transfer of property as a payment, pledge, mortgage, gift, or security."

[2] At the close of business July 26, 1920, the defendant bank had on general deposit account to the credit of the Securities Exchange Company $616,682.21. This was subject to the order of the depositor. The bank was not a creditor of the bankrupt, and it did not receive or hold the funds as the agent or trustee of any creditor or class of creditors of the bankrupt. Having received the deposits, its sole duty was to pay it out on the depositors' orders, and it was not bound to question the legitimacy of the depositors' disbursements. In the case of National Bank v. Insurance Co., 104 U. S. 54, 64, 26 L. Ed. 658, it is said:

"The contract between the bank and the depositor is that the former will pay according to the checks of the latter, and when drawn in proper form the bank is bound to presume that the trustee is in the course of lawfully performing his duty, and to honor them accordingly."

In the case of Goodwin v. American National Bank, 48 Conn. 551, 568, it is held:

"The contract of a bank with a depositor is that it will pay his checks upon his funds in the bank, and if the checks are properly drawn it is bound to pay them. The law will not charge the officers of a bank with knowledge that a depositor is committing a fraud."

See Walker v. Manhattan Bank (C. C.) 25 Fed. 247, 255; Nehawka Bank v. Ingersoll, 2 Neb. (Unof.) 617, 89 N. W. 618; Holden v. Farmer's and Trader's National Bank, 77 N. H. 535, 93 Atl. 1040, L. R. A. 1915E, 309, Ann. Cas. 1917E, 23; Wiley v. Bunker Hill National Bank, 183 Mass. 495, 67 N. E. 655. See, also, In re Zotti, 186 Fed. 84, 108 C. C. A. 196, Ann. Cas. 1914A, 240; Third National Bank of St. Louis v. Ober, 178 Fed. 678, 102 C. C. A. 178.

It is alleged that the defendant participated in a transfer in fraud of creditors. As already said, the bank was not a creditor of the bankrupt. It did not benefit by the payment of the deposit to Ponzi's creditors.

[3] While it is not essential to a preference that the payment should be made directly to the creditor (In re Beerman [D. C.] 112 Fed. 665; Newport Bank v. Herkimer Bank, 225 U. S. 178, 32 Sup. Ct. 633, 56 L. Ed. 1042), payment of checks and vouchers by the bank from the funds of the bankrupt on deposit could constitute a preference only if the bank acted on behalf of the preferred creditors or collusively with the bankrupt and preferred creditors (Dean v. Davis, 242 U. S. 438, 443, 37 Sup. Ct. 130, 61 L. Ed. 419). If there was any preference, it was the investors and not the bank that were preferred. No case has been called to the attention of the court holding that a bank is liable under the Bankruptcy Law to refund money paid out on a depositor's checks, even though the check is given a creditor for the purpose of preferring him. Nothing short of active fraud or collusion on the part of the bank with the preferred creditor could fur-

nish the foundation for the maintenance of such a claim. Rubenstein v. Lottow, 220 Mass. 156, 164, 107 N. E. 718.

[4, 5] In order for plaintiffs to recover on this ground, it must first be shown that the investors who received through Bruno the amount of their original investments stand as preferred creditors, a fact by no means established by the evidence (Lowell v. Brown [D. C.] 280 Fed. 193), and one which the court cannot assume. Upon this point the burden of proof was upon the plaintiffs. Armstrong v. American Exchange Bank, 138 U. S. 433, 468, 10. Sup. Ct. 450, 33 L. Ed. 747. If they rightfully regained possession of money obtained from them by fraud, the defendant bank cannot be held liable to the trustees of the bankrupt for paying it to them on the order of the depositor of the funds, even though it actively participated and aided them into retaking what justly belonged to them.

[6] The bank was legally justified in not paying the checks that exceeded the deposits, and it had the legal right to decline to pay what it had on deposit as a partial payment on the checks. Dana v. Third National Bank, 13 Allen (Mass.) 445, 90 Am. Dec. 216; Beauregard v. Knowlton 156 Mass. 395, 31 N. E. 389; Coates v. Preston, 105 Ill. 470; Gilliam v. Merchants' National Bank, 70 Ill. App. 592; Henderson v. United States National Bank, 59 Neb. 280, 80 N. W. 898.

Plaintiffs filed 19 requests for findings of fact and rulings of law. The defendants filed 128 requests. All requests are denied, except such as are covered by the findings of facts and the rulings of law and such as are deemed immaterial.

My conclusions are that the defendant bank, by receiving money of the bankrupt on a general deposit account subject to the depositor's checks and orders, and paying out the same on such checks and orders, did not create, accept, or participate in a preference, within the meaning of any of the preference clauses of the Bankruptcy Act, so as to become liable to refund the amount of such deposit to the trustees in bankruptcy of the depositor.

August 9, 1920, when the petition in bankruptcy was filed, the defendant bank had on deposit $148.60 belonging to the bankrupt. This it offered to pay over to the trustees before their bill was filed. Upon payment to the trustees of this amount, an order will be made dismissing plaintiffs' bill, with costs to the defendant.