### IRVING TRUST CO. v. MARYLAND CASUALTY CO. et al.
#### No. 16.

Circuit Court of Appeals, Second Circuit.
April 13, 1936.

David W. Kahn, of New York City, for appellant.

William C. Cannon, of New York City, for Metropolitan Cas. Ins. Co.

George S. Mittendorf, of New York City, for Massachusetts Bonding Co.

Edward S. Greenbaum, of New York City, for appellee Maryland Cas. Co.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree, dismissing a bill in equity for lack of equity, filed by a trustee in bankruptcy against grantees and transferees of the bankrupt. The bankrupt is a Delaware company, doing business in New York under license of the Secretary of State; an involuntary petition was filed against it on the 13th of October, 1932; it was adjudicated, and the plaintiff was appointed its trustee in the following December. On January 6, 1932, it was indebted to four surety companies, with which on that day it entered into two contracts on separate dates by which it promised to transfer to the companies or their nominees in payment of its debts to them certain personal property, and to procure the transfer by three of its subsidiaries of certain other real and personal property. Most of the real property was within the state of New York, but one parcel with chattels upon it was in Missouri, one was in Florida, and two were in New Jersey. The chattels consisted of the supplies, furniture, and the like; the other personalty was made up of mortgages, mortgage bonds secured by real property, insurance policies, assignments of rent, accounts receivable, and cash. The bill alleged that at the time

of the contracts the bankrupt was insolvent, or in imminent danger of insolvency; that the transfers were intended to prefer the surety companies, as they well knew or had cause to know; and that in performance of the contracts the subsidiaries conveyed the real property and chattels thereon to nominees of the surety companies, and the bankrupt transferred the bonds, mortgages, accounts, etc., to the companies themselves. The suit was against the companies and the nominees, and was based upon section 114 of the Stock Corporation Law (Consol.Laws N.Y. c. 59) quoted in the margin.* Since the preferences were more than **four months** old at petition filed, the transfers were not voidable under section 67c of the Bankruptcy Law, 11 U.S.C.A. § 107(c). The judge decided that section 114 applied only to the liability of officers, directors, and stockholders of foreign companies and did not make unlawful the transfers themselves; for this reason he dismissed the bill. The plaintiff appealed.

 Section 114 was confessedly passed to fill the gap left in section 15 when Vanderpoel v. Gorman, 140 N.Y. 563, 35 N.E. 932, 24 L.R.A. 548, 37 Am.St.Rep. 601, construed that section as limited to domestic companies. The result was to put domestic companies at a disadvantage as compared with foreign companies licensed by the state to do business within its borders; and in 1897 the Legislature (Laws 1897, c. 384, § 4), made up its mind to end the handicap. The report of the committee then appointed particularly mentioned among other things the desirability of subjecting foreign companies to the same limitations in favor of their creditors which applied to domestic; section 114, then section 60, was the result of their efforts. The question is whether it invalidates the same preferential transfers when made by foreign companies which § 15 invalidates when made by domestic companies, or whether it is limited to imposing liability upon officers, directors, and shareholders. Being a question of the meaning of a New York statute, we should follow the decisions of the Court of Appeals, if there were any; unfortunately there are none, for German-American Coffee Co. v. Diehl, 216 N.Y. 57, 109 N.E. 875, is too far afield to help. So we are left, as since 1898 has been often the case when local insolvency statutes are in question, to our own judgment. It is quite true that verbally the section does not make preferential transfers unlawful, as the district judge observed; it only purports to impose upon "officers, directors and stockholders" the same liabilities for making "illegal transfers of the stock and property of such corporation," which they would be under in the case of domestic companies. But the result of following the words strictly would be that, though the creditors of foreign companies might recover their losses against directors or stockholders who were parties to a preference, the guilty transferees would be secure; and, if the officers and directors were judgment-proof, the creditors could get nothing. It is safe beyond peradventure to assume that a Legislature, bent upon assimilating the position of foreign to domestic companies, would never have consciously perpetuated such a distinction; if the section at bar does so, it must be because the draughtsman did not succeed in expressing what he intended. We do not find ourselves so closely bound by the words. The last of the four liabilities imposed upon officers of foreign companies (the only one now before us) is described in the phrase, "illegal transfers of the * * * property of such corporation when it is insolvent or its insolvency is threatened." If it was the purpose merely to identify the kind of transfer intended without characterizing it as itself "illegal," the adjective was unnecessary; the suffix would have been enough alone; it contained all the elements which made transfers by domestic companies "illegal" ex-

---

* "Liabilities of Officers, Directors and Stockholders. Except as otherwise provided in this chapter, the officers, directors and stockholders of a foreign stock corporation transacting business in this state, except a moneyed or a railroad corporation, shall be liable under the provisions of this chapter, in the same manner and to the same extent as the officers, directors and stockholders of a domestic corporation, for the making of

"1. Unauthorized dividends;
"2. Unlawful loans to stockholders;
"3. False certificates, reports or public notices;
"4. Illegal transfers of the stock and property of such corporation, when it is insolvent or its insolvency is threatened.
"Such liabilities may be enforced in the courts of this state, in the same manner as similar liabilities imposed by law upon the officers, directors and stockholders of domestic corporations."

cept preferential intent. It would not be reasonable to read the word, "illegal," as inserted to supply that omission, for the officers were made liable in any event only "in the same manner and to the same extent" as officers of domestic companies, and to hold them liable regardless of their intent would not be to hold them "in the same manner." One may of course dismiss the whole matter by saying that the adjective was added merely out of abundant caution, and ought to be treated as redundant; but that will not do when we are looking to see whether the pervasive and dominant purpose of the whole section has been defeated by verbal ineptness. We are then justified in insisting literally upon the words used, and if we find that some are redundant unless they embody that purpose, we ought to say that they do embody it. We have no doubt therefore that "illegal" does more than merely identify the transfer on which an officer's liability depends. Ex proprio vigore it declares such transfers to be themselves "illegal." We are not troubled that § 114 gives no remedy against the transferee. Section 15 does indeed declare that he shall be "bound to account" for whatever he receives, but it was unnecessary. Once it be conceded that such transfers are "illegal," courts will find a remedy, just as they did three hundred years ago under the Statute of Elizabeth, which merely declared that the transfer was void.

A more troublesome question concerns the property outside New York. Although the bill does not say where the transfers were made, the contracts required them to be delivered in that state, and we are to assume that the parties performed as stipulated. The receipt of the deeds by the defendants was therefore a wrong, and any liabilities imposed as a remedy would be recognized and enforced elsewhere, for the law of the place where acts occur normally fixes their jural character. Slater v. Mexican National R. Co., 194 U.S. 120, 126, 24 S.Ct. 581, 48 L.Ed. 900; Cuba R. Co. v. Crosby, 222 U.S. 473, 478, 32 S.Ct. 132, 38 L.R.A.(N.S.) 40; Western Union Tel. Co. v. Brown, 234 U.S. 542, 34 S.Ct. 955, 58 L.Ed. 1457; Restatement of Conflict of Laws, § 384. The question here is whether it makes a difference that the wrong consisted in the conveyance of property in another state, under whose laws the conveyance might perhaps have been valid. It is in general no objection to a liability arising out of a consensual transaction that it may be determined by events happening in another jurisdiction. Alaska Packers Association v. Industrial Accident Commission, 294 U.S. 532, 541, 55 S.Ct. 518, 79 L. Ed. 1044. A fortiori it is none that it may have indirect effects upon extraterritorial rights. But it might nevertheless be true that when the transaction consisted in the transfer of property situated elsewhere and would be valid by the lex rei sitae, the act of conveyance would not be a wrong where executed, though the law of that place forbad it as respects property within its own borders. The local doctrine of conflict of laws might impose that exception upon the general language of the statute. The doctrine is of course well settled, certainly as to real property, and, as we shall assume arguendo, equally at the present time as to personal, that the law of the situs absolutely determines the validity of conveyances wherever made. No title will pass and no interest will arise, save as that law prescribes. Goddard v. Sawyer, 9 Allen (Mass.) 78; Chillingworth v. Eastern Tinware Co., 66 Conn. 306, 315–319, 33 A. 1009; First Nat. Bank v. Henderson, 187 Ala. 285, 65 So. 949; Manton v. J. F. Seiberling & Co., 107 Iowa, 534, 78 N.W. 194; Fowler v. Bell, 90 Tex. 150, 37 S.W. 1058, 39 L.R.A. 254, 59 Am.St.Rep. 788; Boehme v. Rall, 51 N.J.Eq. 541, 26 A. 832. We have no doubt therefore that title passed by the deeds delivered in New York to property situated in those of the three states whose laws did not forbid such transfers; yet the law of New York might still make receipt of the deed a wrong and impose a liability upon the grantee though he got a good title. That would not trench upon the sovereignty of the state of the situs whose power over the res would remain wholly unimpaired. Nobody would question this so far as concerned the grantee's liability in damages; it would be but reasonable that he should become liable to the grantor's creditors just because his title was unimpeachable. In the case of contracts for the sale of land the lex loci contractus certainly controls. Selover, Bates & Co. v. Walsh, 226 U.S. 112, 33 S.Ct. 69, 57 L.Ed. 146; In re Barrett, 12 F.(2d) 73, 77, 78 (C.C.A.2). Our decision in Hotel Woodward Co. v. Ford Motor Co., 258 F. 322, is not to the contrary; Judge Hough expressly approved

(258 F. 322, at page 328) the doctrine that the validity of the contract was solely dependent on that law, but, as he was construing the New York statute of frauds, he felt bound to follow the rulings of the Court of Appeals. True, the same doctrine might not apply to the remedy of specific restitution, or specific performance; English speaking courts have always been sensitive about land and in recent years the doctrine of the lex rei sitae has been extended to chattels. Yet in principle there ought to be no distinction between the remedies, for, as we have said, one would invade as little as the other the sovereignty of the state of the situs, which would be free to refuse any effect to the enforced conveyance, if it chose. The result of such a refusal upon a suit elsewhere might indeed be crucial, but only because, seeing that its remedy would be futile if granted, the court would decline to act at all, when, as here, there is no reason to suspect that the lex rei sitæ would not recognize such conveyances as valid though made under the duress of a decree, there is no reason to hesitate.

The authorities are not indeed many; but it is necessary at the outset to lay aside those we have cited which dealt with fraudulent conveyances, bad where made, but good under the law of the situs. So far as we have found they do not make the distinction we have just mentioned; they merely declare that the validity of the transfer is determined by the law of the place; they do not discuss the remedies available to the creditors of the grantor. We have therefore no reason to suppose that they would not treat as torts transfers forbidden where made, or that they would deny the remedy of specific restitution as well as damages. There are a few cases which do raise the point and they support our view. The first is Lord Cranstown v. Johnson, 3 Ves.Jr. 170, where the defendant in England beguiled the plaintiff into letting him pursue his remedies against land in St. Kitt's. The law of St. Kitt's gave the plaintiff no remedy either in equity, or at law. Yet Lord Alvanley held that the defendant's conduct in England raised a liability for which he could award specific restitution. In Ex parte Pollard, Mont.&C. 239, the defendant in England pledged to the plaintiff his title papers to land in Scotland, which would have created a valid equitable lien upon English land, but did not upon Scotch. Lord Cottenham held the defendant to be subject to an equitable obligation which could be enforced specifically in personam. Cood v. Cood, 33 Beav. 314, is a somewhat similar case. The leading authority in this country is Justice Holmes' opinion in Polson v. Stewart, 167 Mass. 211, 45 N.E. 737, 36 L.R.A. 771, 57 Am.St.Rep. 452, which he reiterated, though speaking only for himself, in Fall v. Eastin, 215 U.S. 1, 14, 15, 30 S.Ct. 3, 54 L.Ed. 65, 23 L.R.A.(N.S.) 924, 17 Ann.Cas. 853, and which was approved in Selover, Bates & Co. v. Walsh, supra, 226 U.S. 112, 123, 124, 33 S.Ct. 69, 57 L.Ed. 146. The Restatement of Conflict of Laws, § 218(f) and § 218(g), as we read it, is in accord; the validity of the conveyance depends upon the lex rei sitæ, but any court may compel the tortfeasor specifically to restore the property, whatever the law of the situs. Professor Beale discussed the whole question in an article entitled "Equitable Interests in Foreign Property" in 1907 (20 Harv.L.R. 382), where he supported the doctrine with certain limitations not here important. He observes, and we agree, that the doctrine must not be confused with the creation of equitable liens, which are like any other interest in re. That need not trouble us here; to compel a fraudulent grantee to disgorge it is not necessary to evoke an equitable lien. The difference is put in a nutshell in the concurring opinion of Holmes, J., in Fall v. Eastin, supra. Some of the relief asked by the bill cannot therefore be granted; the court cannot adjudge the transfers void as to land and chattels outside the state, except as the lex rei sitæ is the same as section 114. But under his general prayer the plaintiff, if he proves his case, may have a decree as to any of the property transferred directing the defendants to reconvey it, and this he can enforce in personam. Of course he may also recover damages as a substitute if he so elects.

Decree reversed; defendants to answer over.