David E. FELDMAN, as Trustee in Bankruptcy of General Textile Processors,
Plaintiff,

v.

CAPITOL PIECE DYE WORKS, INC.,
Samuel Koenig, Gilbert Koenig and the
Peoples Bank of Haverstraw, Defendants.

United States District Court
S. D. New York.

June 23, 1960.

Harper & Matthews, New York City, for plaintiff; Harold Harper, A. R. Gaetjens, New York City, of counsel.

Samuel Miller, Haverstraw, N. Y., for defendants, Capitol Piece Dye Works, Inc., Samuel Koenig and Gilbert Koenig.

John M. Friedman, New York City, for defendant, the Peoples Bank of Haverstraw.

BRYAN, District Judge.

This is an action by a trustee in bankruptcy to recover funds of the bankrupt alleged to have been preferentially or fraudulently transferred and the value of inventory allegedly converted from the bankrupt. The case was tried to the court without a jury.

The complaint contains ten separately stated claims. The first nine claims against defendants Capitol Piece Dye Works, Inc. (Capitol), and Samuel and Gilbert Koenig who owned and completely controlled Capitol, include the following transactions, all of which took place within four months prior to the filing of the petition on November 7, 1956:

1. A transfer of $35,839.56 made on September 21, 1956.

2. A transfer of $1,000 on October 22, 1956.

3. The conversion of inventory of the bankrupt consisting of chemicals, dyestuff and similar materials valued at $28,495.95 on or about November 2, 1956, when the bankrupt suspended business.

4. A transfer of $20,160.81 balance in one of the bankrupt's corporate bank accounts, on November 5, 1959.

It is alleged that these transactions in various aspects violated Sections 60, 67, sub. d and 70, sub. e of the Bankruptcy Act, 11 U.S.C.A. §§ 96, 107, sub. d, 110,

sub. e; Section 274 of the New York Debtor and Creditor Law, McKinney's Consol.Laws, c. 12; Sections 15, 58, 59 and 114 of the New York Stock Corporation Law, McKinney's Consol.Laws, c. 59; and Title 14, Chap. 14, Section 2, Title 14, Chap. 8, Sections 10 and 19, and Title 25, Chap. 2, Section 11 of the Revised Statutes of New Jersey, N.J.S.A. In view of the clear applicability of certain of these statutory provisions it will be unnecessary to consider the others.

The tenth claim alleged in the complaint is against defendant the Peoples Bank of Haverstraw only. It is alleged that the Bank wrongfully permitted the withdrawal and misapplication of the balance of $20,160.81 in the bankrupt's bank account by the other defendants.

These transactions must be considered in the following setting:

The bankrupt, General Textile Processors, Inc., was incorporated under the laws of New Jersey on June 1, 1956, to carry on the business of finishing and dyeing cloth which had theretofore been conducted by seven separate corporations with plants in New York, New Jersey and elsewhere, who organized the new corporation. The bankrupt commenced operations on September 1, 1956 and continued for only two months until November 2, 1956, when business was permanently suspended. The venture was ill-fated from its inception and was a disastrous failure.

At the time the bankrupt was organized conditions in the finishing and dyeing business were abysmally poor. It was apparent that there was not sufficient business to keep the seven companies who formed the new corporation going. By channeling such business as was available to a single consolidated corporation the organizers hoped to stave off individual failures and to be able to carry on an economical and profitable operation which could dispense with unnecessary plant equipment and personnel and eliminate wasteful marginal competition.

Defendant Capitol, a New York corporation, was one of the participating companies. Defendant Samuel Koenig, and his son defendant Gilbert Koenig, were the sole stockholders of and controlled Capitol which had operated a finishing and dyeing plant near Garnersville, New York, for a number of years. Samuel Koenig was president of Capitol and Gilbert Koenig was its secretary and directed its finishing and dyeing operations.

The total paid-in capital stock subscriptions of the bankrupt were $22,549.-98, and were subscribed to by the owners of the various participating companies. The Koenigs were subscribers for a proportionate share of the Class A common stock. The seven participating companies, or their representatives, also paid in $67,649.96 for five year debenture bonds to be issued by the bankrupt. Neither the stock nor the bonds were ever actually issued.

The basic organization agreement provided that the plants of the various participating companies were to be leased or subleased to the bankrupt at an aggregate rental of $499,700 per year, that work in process of the various participants, valued at $47,086, was to be taken over by the bankrupt, and that the inventories of six of the participants, consisting largely of chemicals, dyestuffs and other substances used in finishing and dyeing, were to be purchased by the bankrupt at prices aggregating $164,650. The new corporation also took over most of the employees of the participants and was obligated to meet a payroll of approximately $10,000 a day.

While the plants of each of the seven participants were leased or subleased to the new corporation, only four were in actual operation on September 1, 1956 when the new venture commenced its operations. The Capitol plant at Garnersville, New York, was one of those still in operation since the Koenig business was in rather better condition than some of the others.

Samuel Koenig became treasurer of the new corporation, a director and a member of its finance committee, as well

as a subscriber to its stock. Gilbert Koenig was assistant secretary of the bankrupt in charge of operating the Garnersville plant formerly operated by Capitol and a subscriber to its stock. Through their ownership of Capitol both were large creditors. Both were paid salaries of $20,000 per year.

The new venture never got off the ground. It operated at a loss from the beginning. There was dissension and acrimony among the organizers, and it soon became apparent that operations would have to be discontinued.

An equity receiver was appointed for the bankrupt by the New Jersey courts on November 5, 1956. On November 7, 1956 an involuntary petition in bankruptcy was filed in the United States District Court for New Jersey, and the previously appointed receiver was continued as receiver in bankruptcy. An order of adjudication was entered on November 26, 1956, and on March 19, 1957 plaintiff was appointed trustee.

### 1. The transfer of $35,839.56 on September 21, 1956.

Under the basic agreement for the organization of the bankrupt entered into by the seven participating companies, Capitol's inventory of dyestuffs, chemicals and other finishing materials was purchased by the bankrupt at a price of $55,137.78. The bankrupt took over this inventory at Capitol's Garnersville plant when the bankrupt commenced operations on or about September 1, 1956. Payment of the purchase price was to be made 25% in 55 days, 25% in 75 days, 25% in 90 days and 25% in 120 days.

Thus, the first payment of approximately $13,000 was not due until late October 1956.

On or about September 19, 1956 Samuel Koenig made an arrangement with Jersey-Prospect Co., a factor, whereby the bankrupt assigned all its accounts receivable to the factor and the factor agreed to advance to the bankrupt 85% of the net value of such accounts. On September 21, 1956 Jersey-Prospect gave its check to Capitol in the sum of $35,-839.56, representing 65% of the amount of $55,137.38 owed to Capitol by the bankrupt for the inventory purchased. Capitol in turn assigned to Jersey-Prospect Capitol's account receivable from the bankrupt for the inventory purchase price. After making the 65% payment of $35,839.56 to Capitol, Jersey-Prospect reimbursed itself for the amount so paid out of the proceeds of the assigned accounts receivable of the bankrupt which were in its hands.

There is no doubt that these arrangements were all made by Samuel Koenig as part of a single transaction and that it was contemplated from the commencement of the arrangements that Jersey-Prospect would reimburse itself for the payment to Capitol out of the proceeds of the bankrupt's accounts receivable as was done.

■ It is plain that by this transaction Capitol secured a preferential transfer within the meaning of Section 60, sub. a of the Bankruptcy Act and I so hold.

The payment to Capitol was clearly a payment to a creditor on account of an antecedent debt made within four months of the filing of the petition. Capitol was enabled to obtain payment of 65% of the debt owed it by the bankrupt under this arrangement and Jersey-Prospect in turn was to, and did, obtain, reimbursement for this payment of the bankrupt's indebtedness to Capitol from the bankrupt's funds.

Whether the factor was reimbursed from the 85% of the bankrupt's accounts receivable, which it had agreed to advance to the bankrupt, or out of the 15% reserve, as defendant claims, is of no moment. In either event the reimbursement came from the funds of the bankrupt and the effect of the transaction was to secure immediate payment of the major portion of the bankrupt's antecedent deferred indebtedness to Capitol.

■ It of course makes no difference that Capitol received payment from the factor rather than directly from the bankrupt. Transfers under the Bank-

ruptcy Act include every mode of disposing of or parting with property direct or indirect, and what is involved here is plainly a transfer within the meaning of the Act. Pirie v. Chicago Title & Trust Co., 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171; Grandison v. National Bank of Commerce, 2 Cir., 231 F. 800, certiorari denied 242 U.S. 644, 37 S.Ct. 213, 61 L.Ed. 542; National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042; Bankruptcy Act, § 1(30), 11 U.S.C.A. § 1(30).

■ The bankrupt was insolvent at the time of the transfer. The test of insolvency under § 60 of the Bankruptcy Act is the balance sheet test—whether liabilities exceed assets.[1]

A balance sheet prepared by the accountant for the trustee shows that as of September 1, 1956, the first day of operations, the bankrupt's liabilities amounted to $361,666.80, while its assets were only $301,831.84, an excess of liabilities over assets of $59,834.96. Balance sheets prepared by the same accountant as of September 21, 1956 and September 30, 1956 show that liabilities exceeded assets on those dates by $158,514.07 and $196,500.94 respectively. The profit and loss statement prepared by the accountant for the trustee as of September 30th shows the loss for September to have been $219.050.92. On these statements it appears the bankrupt was insolvent from the very beginning of its operations. Even the balance sheet prepared by bankrupt's accountant as of September 30, 1956 clearly shows insolvency as of that date also. In that balance sheet the excess of liabilities over assets is shown to be $88,225.98. However, if the bond indebtedness, which is not shown as a liability by the bankrupt's accountant were added to the liability column, the deficit would be $155,875.94.

■ Defendants wholly failed to sustain their claim that the bankrupt was solvent at the time of the transfer. They claim (1) that organization expenses of $40,625 should have been listed as an asset on the balance sheet of September 1, 1956 on the ground that normal accounting procedures would require that such expenses be amortized over the period of the corporation's existence; (2) that the value of the bankrupt's leaseholds should have been listed as assets; and (3) that the so-called debenture bonds of $67,649.-96 should not have been listed as a debt on the ground that though called debenture bonds they actually represented capital investment on the part of the organizers. None of these contentions have any merit.

■■ There was no justification for considering organization expenses and leaseholds as assets. Section 1(19) of the Bankruptcy Act requires that assets be taken "at a fair valuation". Grandison v. National Bank of Commerce of Rochester, 2 Cir., 231 F. 800, certiorari denied 242 U.S. 644, 37 S.Ct. 213, 61 L.Ed. 542; Syracuse Engineering Co. v. Haight, 2 Cir., 110 F.2d 468. Neither the organization expenses nor the leaseholds were salable assets. They therefore cannot be considered in determining solvency or insolvency. See Irving Trust Co. v. Manufacturers Trust Co., D.C.S.D.N.Y., 6 F.Supp. 185, 189.

Defendants cite such cases as Charles L. Huisking & Co., 4 T.C. 595, and 241 Corporation v. Commissioner, T.C.Memo 1956—174, aff'd 2 Cir., 242 F.2d 759, certiorari denied 354 U.S. 938, 77 S.Ct. 1401, 1 L.Ed.2d 1539, in support of the proposition that the bond indebtedness must be treated as capital investment. These are income tax cases and have nothing to do with the case at bar. But even if they did the case at bar lacks the element usually present in such cases—a

---

1. "A person shall be deemed insolvent within the provisions of this Act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts." Bankruptcy Act, § 1(19).

marked disproportion between loaned capital and capital stock. The ratio in the case at bar is 3 to 1, and there is no marked disproportion here.

I find that the balance sheets in evidence prepared by plaintiff's accountant are substantially correct and fully establish that the bankrupt was insolvent on September 21, 1956.

There is no doubt that the defendants Samuel and Gilbert Koenig, and the defendant Capitol, knew or had reasonable cause to believe that the bankrupt was insolvent on that date. The industry was in dire straits. Dissension among the officers and directors of the bankrupt and threats of withdrawal took place even before business commenced. Samuel Koenig as treasurer, director and a member of the bankrupt's financing committee, was active in the business on a day to day basis. There was no reason to doubt that he knew, or at the very least should have known, of the bankrupt's insolvency. If he did not have actual knowledge of the insolvency, and there are strong indications that he did, all he had to do to ascertain that fact was to make relatively simple calculations. All the necessary data was available to him. Samuel Koenig himself arranged the transfer to Capitol and was quite aware of its purpose and effect.

Gilbert Koenig was also one of the organizers of the bankrupt and a substantial investor. He was familiar with the preliminary negotiations and the parlous condition of the business at the inception of operations. He was assistant secretary of the bankrupt and in charge of operations at the Garnersville plant and was paid a salary of $20,000 a year.

Gilbert Koenig kept in close contact with his father and from time to time attended conferences and meetings concerning the bankrupt's affairs. As one of the two controlling owners of Capitol and its secretary, and in active charge of its branch of the business, he must have been familiar with the transfer and its purpose. While not as familiar on a day to day basis with the bankrupt's

overall problems, as was his father, nevertheless, if he did not actually know that the bankrupt was insolvent on the date of the transfer, he had reasonable cause to believe that it was insolvent.

Capitol was but the alter ego of the Koenigs, its owners and directing heads. The knowledge of the Koenigs was the knowledge of Capitol.

At the very least Samuel and Gilbert Koenig and Capitol were put on inquiry of the debtor's insolvency and that is sufficient to establish this element of a preferential transfer in violation of Section 60, sub. b. Pender v. Chatham Phenix Nat. Bank & Trust Co., 2 Cir., 58 F.2d 968; Irving Trust Co. v. Manufacturers Trust Co., supra; C. A. Swanson & Sons Poultry Co. v. Wylie, 9 Cir., 237 F.2d 16.

I find that defendants Samuel and Gilbert Koenig and Capitol had reasonable cause to believe that the bankrupt was insolvent on September 21, 1956.

The effect of the transfer was to enable Capitol to obtain a greater percentage of its debt than other creditors of the same class. It received payment of 65% of its claims for material and supplies. Whatever claims it had for work in process were paid almost in full.

There is no need to discuss in any detail the condition of the estate. At the time of trial the trustee had on hand for payment of administration expenses and distribution to creditors less than $10,000. Claims filed with the referee amounted to some $371,000 and included priority wage claims in excess of $31,000 and priority tax claims exceeding $38,000. There was proof at the trial that there were specific provable claims of general creditors in excess of $30,000 and there is no real doubt that the provable claims of general creditors amounted to several times that sum. From the proof adduced at the trial it is apparent that there will be nothing available for general creditors, to which class Capitol belongs.

The plaintiff has established that the transfer of $35,839.56 to Capitol

on September 21, 1956 was a preferential transfer under Section 60, sub. b of the Bankruptcy Act, and both Capitol and Gilbert and Samuel Koenig, who owned, controlled and directed its activities, are liable to the trustee therefor and I so hold. Moreover, both Samuel and Gilbert Koenig clearly acted in violation of their fiduciary obligations as officers of the bankrupt to the bankrupt and its creditors and are liable for that breach of duty in any event.

### 2. The payment of $1,000 on October 22, 1956.

On October 22, 1956 the bankrupt paid Capitol the sum of $1,000 on account of a debt of $1,087.40 then owing by the bankrupt to Capitol for the work in process sold by Capitol to the bankrupt at the outset of the enterprise, on or about September 1, 1956.

By October 22 the whole venture was rapidly collapsing and it fell apart completely within two weeks thereafter. The financial condition of the bankrupt constantly worsened subsequent to September 21, 1956 when, as I have found, it was already insolvent.

In fact it follows from my previous findings that all of the elements of a preferential payment in violation of Section 60 of the Bankruptcy Act were present as to this transfer.

I find that the payment of $1,000 by the bankrupt to Capitol on October 22, 1956 was a payment on account of an antecedent debt made while the bankrupt was insolvent, and within four months of bankruptcy, the effect of which gave Capitol a greater percentage of its debt than other creditors of the same class and that defendants Samuel and Gilbert Koenig and Capitol had reasonable cause to believe that the bankrupt was insolvent at the time payment was made. It was therefore a preferential transfer under Section 60, sub. b of the Bankruptcy Act.

Samuel and Gilbert Koenig breached their fiduciary obligations to the bankrupt and its creditors on this transaction likewise. These defendants are liable to the trustee for the amount of such transfer and I so hold.

### 3. The conversion of inventory on November 2, 1956.

On November 2, 1956, on the eve of bankruptcy, the Koenigs and Capitol took over the inventory of the bankrupt at the Garnersville plant consisting of chemicals, dyestuff and other substances used in finishing and dyeing. No payment was made for the inventory taken over and none of it was surrendered to the trustee. Capitol resumed its own finishing and dyeing business and used this inventory in its business. There was only a short interruption of operations and Capitol continued to operate on its own with the same personnel under direction and control of the Koenigs.

Defendants Samuel and Gilbert Koenig and Capitol do not dispute that they are liable to the trustee for the value of this inventory. The dispute arises as to what the value of the inventory is.

The cost of the inventory to the bankrupt shortly before the conversion occurred was $28,495.95. Capitol continued to use this inventory in the continuous operations of its Garnersville plant which it took back from the bankrupt and which it operated with the same personnel and in the same manner as when it was operated by the bankrupt. Gilbert Koenig continued in charge of actual operations for Capitol and the Capitol business was directed and controlled by both the Koenigs.

The defendants contend that the inventory should not be valued at cost but at the price which it would have brought if sold on the open market. According to defendants' expert witness the inventory could have been sold only for 20% to 25% of its original cost. Defendants therefore urge that their liability should be limited to $7,000 on this claim. There is no merit to this contention.

In the first place there is no ready market for the resale of these materials. In the second place, Capitol, the tort-feasor, continued to use the products and would have had to purchase them

at the cost to the bankrupt had it not converted the bankrupt's inventory. Under these circumstances replacement value of the materials is a proper valuation. Cutler-Hammer v. Troy, 283 App.Div. 123, 126, 126 N.Y.S.2d 452.

One factor claimed by defendants to reduce the value of the inventory was alleged difficulty in ascertaining the quality of dyes kept in open containers. But here the Koenigs and Capitol knew exactly what they were getting. No risk was involved in taking over inventory for defendants were thoroughly familiar with its nature and quality and indeed had arranged for its purchase.

It may be noted that the inventory sold by Capitol to the bankrupt on September 1 was sold at 100% of cost except as to items more than 90 days old and in open containers. There is no evidence that the inventory taken over by Capitol from the bankrupt contained any items in open containers more than 90 days old.

■ I find that the value of the inventory converted by the Koenigs and Capitol from the bankrupt was $28,495.-95, the cost of the inventory to the bankrupt. The defendants Samuel and Gilbert Koenig and Capitol are liable therefor.

4. The transfer of the $20,160.81 in bankrupt's account with The Peoples Bank of Haverstraw.

On September 13, 1956 the bankrupt opened an account in the Peoples Bank of Haverstraw for the purpose of meeting the payroll at the nearby Garnersville plant formerly operated by Capitol. Samuel Koenig made the arrangements with the Bank. He had had satisfactory dealings with the Bank for many years and was a valued customer.

Any one of four officers of the bankrupt were authorized to sign checks on the account—Dean M. Louis, president, Arthur Nazarro, vice president, A. D. Nazarro, secretary, and Samuel Koenig, treasurer. Regular weekly deposits were made in the account between September 13 and October 26 to supply funds to meet the Garnersville payroll. However, no regular deposit was made on Friday, November 2. On that day, when the bankrupt finally suspended business, there was $10,660.81 in the account.

On that day Samuel Koenig obtained from Jersey-Prospect, the bankrupt's factor, a check to the order of the bankrupt in the sum of $9,500 as a further advance on the bankrupt's factored accounts receivable. At the opening of the Bank on Monday, November 5, Samuel Koenig deposited this check in the bankrupt's account, increasing the balance to $20,160.-81. He then advised the vice president and cashier of the Bank that he wished to close out the corporate account, and at his request this officer telephoned Chase Manhattan Bank in New York on which the $9,500 check had been drawn, to verify that the check was good.

When this had been done a check was drawn on the bankrupt's account to the order of "Samuel Koenig" for the full amount of the balance in the account, and a notation was made by the Bank's vice president and cashier that the check was "to close" the account. The check was signed by "S. Koenig, Treasurer".

At the same time it was arranged with the vice president and cashier to open a new account at the Bank under the name "S. Koenig, Special for Payroll". The only person authorized to draw against the new account was Samuel Koenig. Apparently there was no discussion with the bank's vice president-cashier as to the reasons for closing the corporate account and putting the funds in the S. Koenig Special Payroll Account, and the bank made no inquiry as to the purpose of this transaction. However, the bankrupt's account was closed and the Koenig account was opened with its full knowledge.

The complaint for the appointment of a receiver was presented to the New Jersey court during the course of November 5 and an order appointing the receiver was signed. This order was filed on November 7 and on the same day an involuntary petition in bankruptcy was filed in the United States District Court for New Jersey.

Thereafter between November 7 and November 26, the date of adjudication, all of the funds in the S. Koenig Special Payroll Account were drawn out with the exception of $1.76 remaining on deposit. The Bank was not informed prior to November 26, 1956 that a receiver had been appointed or that General Textile Processors was in bankruptcy, and did not know of these facts.

A number of payroll checks amounting to $9,896.59 were drawn on the bankrupt's corporate account in the usual manner prior to November 5. These were honored and paid out of the Koenig Special Payroll Account. Other checks for the last week's payroll of the bankrupt amounting to $7,453.09, drawn in the same manner, were paid on November 9, 1956. Other checks were drawn in like manner to Samuel Koenig for $960.53, to Gilbert Koenig for $658.40, to a salesman, Robert Lee, for $867.60, to Milton Mandel, another officer of the bankrupt for $324.60, all on account of salary, and others for miscellaneous other salary claims and for union dues. At Samuel Koenig's instructions all of these checks, drawn on the bankrupt's corporate account, were paid out of the S. Koenig Special Payroll Account.

Plaintiff contends that both of the Koenigs, Capitol and the Bank are liable to the trustee for the full amount of the balance of $20,160.81, the amount withdrawn from the bankrupt's account on November 5 and paid out through the Koenig payroll account in this fashion.

A. As to Samuel Koenig.

Samuel Koenig himself transferred the funds in the bankrupt's account to his individual account and he arranged for their disbursement. As to the payments to himself, his son and other salaried employees of the bankrupt, these were clearly preferential payments, as Koenig well knew. The balance of the payments for wages were also preferential. There are priority wage claims of some $31,000 and the wage claimants who were paid by Koenig received a greater percentage of their debts than other creditors of the same class.

These payments were not made by Samuel Koenig out of charitable impulse, if that were relevant here. Koenig, as one of the two owners of Capitol, made the payments so that Capitol could retain the bankrupt's work force in the Garnersville plant intact and could resume operations there with the least possible delay and inconvenience after the bankrupt had ceased doing business.

Capitol did resume operation within five days after the bankrupt discontinued, and continued to operate for the benefit and profit of the Koenigs at the plant at Garnersville. The evidence indicates that at the time the payments were made Koenig had already resigned as treasurer of the bankrupt and his interests were entirely centered on the resumption of the Capitol business at the earliest possible moment. Samuel Koenig is plainly liable for the amount which he withdrew from the bankrupt's account, transferred to his individual account, and used to make preferential payments for the benefit of himself and his own business.

Quite apart from Samuel Koenig's breach of his fiduciary obligation to the bankrupt, its stockholders and creditors, the evidence overwhelmingly establishes a clear violation by him of Section 15 of the New York Stock Corporation Law which is applicable under Section 70 of the Bankruptcy Act.[2] What Samu-

2. Section 114 of the New York Stock Corporation Law extends the liabilities under Section 15 of that statute to foreign corporations transacting business in New York. Not only did the bankrupt carry on a substantial portion of its business in New York but the transaction with which we are concerned here took place entirely in New York. Thus the application of Section 114 is even more appropriate here than it was in Irving Trust Co. v. Maryland Casualty Co., 2 Cir., 83 F.2d 168, 111 A.L.R. 781, certiorari denied 299 U.S. 571, 57 S.Ct. 34, 81 L.Ed. 421.

el Koenig did was to take the funds of the bankrupt and deliberately and intentionally prefer a group of creditors which he favored over other creditors of the bankrupt of the same class. The wage claimants who worked at the Garnersville plant which the Koenigs and their corporation took over from the bankrupt, were preferred over the numerous and substantial other wage claimants. There is no doubt as to the liability of Samuel Koenig, the treasurer of the bankrupt, for this preferential transfer under Section 15 of the New York Stock Corporation Law even though the transferees themselves might not be liable. The liability of officers for making such payments under Section 15 is treated quite separately from the liability of the transferees.

 There is no need to discuss Samuel Koenig's knowledge of the hopeless insolvency of the bankrupt, and, as the evidence also shows, of the imminence of bankruptcy. The transfer to this favored group of wage claimants was made to serve the interests of the Koenigs and their own business, and with the purpose of preferring this group of creditors over all others similarly situated. I hold that in making such transfer Samuel Koenig acted in violation of Section 15 of the New York Stock Corporation Law and is liable to the trustee for the full amount of the funds so paid. Cf. Margolis v. Gem Factors Corp., 2 Cir., 201 F.2d 803.

### B. As to Gilbert Koenig.

 Gilbert Koenig was also an officer of the bankrupt. His father testified that Gilbert Koenig was present when the proposal to transfer the corporate bank account and to disburse such funds for the purpose of taking care of the employees at the Garnersville plant was discussed, and knew all about the transaction. Gilbert Koenig's denials of such knowledge cannot be given credence in the light of his intimate tie-up with his father in the Capitol venture, his actual receipt of one of the preferential payments, and his efforts at that very time in conjunction with his father to arrange for the resumption of operations at the Garnersville plant by Capitol. I find that Gilbert Koenig was a participant with his father and was "concerned" in the transfer of these funds from the corporate account and their payment to this favored group of wage claimants. There is no doubt that Gilbert Koenig knew of the imminence of the bankruptcy and had the intent to prefer the Garnersville wage claimants over other wage claimants and other creditors for the benefit of the Koenig's Capitol business. He is therefore liable to the trustee for the full amount of the payments so made under Section 15 of the New York Stock Corporation Law.

### C. As to Capitol.

 Although the Koenig's purpose in making these preferential payments was to benefit Capitol of which they were the owners, I do not find that any basis has been established for holding Capitol liable under any of the statutes on which plaintiff relies. The payments were not made to Capitol but to claimants who had legitimate wage claims against the bankrupt. Any indirect benefits which Capitol may have received by way of holding its potential work force intact or otherwise are too intangible to fall within any of the statutes upon which the plaintiff relies. See Duell v. Brewer, 2 Cir., 92 F.2d 59, 112 A.L.R. 1246.

### D. As to The Peoples Bank of Haverstraw.

The plaintiff asserts that the Bank not only had full knowledge of the transfer of the balance in the bankrupt's account to the S. Koenig Special Payroll Account through its vice-president and cashier, but also actually participated in this transaction by arranging the mechanics of the transfer. He claims that Samuel Koenig had no actual authority to make the transfer since he had submitted his oral resignation as treasurer of the bankrupt on November 2, 1956, the Friday before the transfer occurred, and that such general authority to sign checks as was conferred on Koenig by the filed signature card did not give him even appar-

ent authority to draw out the entire balance and transfer it to his account in the absence of an appropriate corporate resolution. Plaintiff points to the further fact that the Bank's vice-president and cashier made inquiry at Samuel Koenig's request concerning the $9,500 check from the factor which Koenig had brought up for deposit and knew that this deposit was being immediately transferred to Koenig's personal account. Plaintiff contends that all this put the Bank on notice that the funds were being improperly diverted by Koenig from the corporate account, that the Bank acquiesced in the transaction with such knowledge and is therefore liable for the full amount transferred.

On the other hand, the Bank relies on the evidence that it had no knowledge of the impending bankruptcy, or, indeed, of any financial difficulties of the bankrupt until November 26, the day of adjudication, when the funds had already been fully disbursed, that it had had satisfactory dealings with Samuel Koenig for many years and had no reason to be suspicious of him, that the transfer was made to a special account for payroll and that all checks paid from that account were in satisfaction of payroll and other legitimate obligations of the bankrupt. It therefore asserts that it is under no liability in the premises.

■ Even if it be assumed that the bank breached its obligation to the bankrupt by permitting the transfer, as the plaintiff contends, the plaintiff has failed to establish that the Bank is liable here.
■ If the Bank permitted a corporate officer or other fiduciary to withdraw funds from a corporate or other fiduciary account, and such funds were used for his own purposes with actual or constructive knowledge to the Bank that this would occur, the Bank would be liable for the loss suffered. See Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, L.R.A.1916F, 1059; Commercial Trading Co. v. Trade Bank & Trust Co., 286 App. Div. 722, 146 N.Y.S.2d 570; E. Moch Co. v. Security Bank of New York, 176 App.Div. 842, 163 N.Y.S. 277, affirmed

225 N.Y. 723, 122 N.E. 879. However, the Bank's obligation is for the *loss* suffered by the corporation and there is no liability in the absence of loss.

Here Samuel Koenig used the fund deposited in the Special Payroll Account for legitimate corporate obligations of the bankrupt. The checks drawn against the Special Payroll Account were checks of the bankrupt and in fact drawn on the bankrupt's own account and paid out of the funds transferred to the new account. Such payments would have been made even if the transfer had not occurred, for the receiver never communicated with the Bank or attempted to take possession of the bankrupt's funds.

■ The Bank's obligation was to the corporate bankrupt to whom the account belonged. It had no knowledge of bankruptcy, insolvency, the appointment of a receiver, or financial failure. Unless it be shown that these funds were diverted from legitimate corporate purposes by reason of the transfer no loss or damage by reason of the transfer has been shown and no liability to the bankrupt corporation has been established. Mere transfer from a fiduciary account to a personal account does not, without more, result in a conversion. There must be a diversion of the funds from the trust purposes. Bischoff v. Yorkville Bank, supra; Whiting v. Hudson Trust Co., 234 N.Y. 394, 138 N.E. 33, 25 A.L.R. 1470.

■ Here there was no loss to the bankrupt by reason of the transfer. Any loss or damage which occurred was to other priority wage creditors because of the preference obtained by other creditors of the same class. The Bank owed no duty to the creditors of the bankrupt beyond that which it owed to the corporation itself and breached no duty to them. It is not liable for any loss which may have been suffered by creditors because of preferential payments made in satisfaction of legitimate corporate obligations. See Lowell v. Merchants National Bank, D.C.N.H., 283 F. 124, affirmed sub nom. Cunningham v. Mer-

chants National Bank, 1 Cir., 4 F.2d 25, 41 A.L.R. 529.

Thus, plaintiff has failed to establish any liability on the part of defendant Bank.

Plaintiff is entitled to recover from the defendants Samuel Koenig and Gilbert Koenig on all of the four transactions in suit in the total amount of $85,496.32, with interest on $35,839.56 from September 21, 1956, on $1,000 from October 22, 1956, on $28,495.95 from November 2, 1956, and on $20,160.81 from November 5, 1956.

Plaintiff is entitled to recover from defendant Capitol on the first three transactions in suit in the total amount of $65,335.51, with interest on $35,839.56 from September 21, 1956, on $1,000 from October 22, 1956, and on $28,495.95 from November 2, 1956.

Defendant, The Peoples Bank of Haverstraw, is entitled to judgment in its favor against the plaintiff.

Judgment will be entered accordingly.

The foregoing opinion will constitute my findings of fact and conclusions of law.