293 F.2d 889
 David E. FELDMAN, as Trustee in Bankruptcy of General Textile Processors, Plaintiff-Appellant,
v.
CAPITOL PIECE DYE WORKS, INC., Samuel Koenig and Gilbert Koenig, Defendants-Appellants, and
The Peoples Bank of Haverstraw, Defendant-Appellee.
 No. 242.
 Docket 26486.
 United States Court of Appeals Second Circuit.
 Argued February 21, 1961.
 Decided August 18, 1961.
 
 1
 Harper & Matthews, New York City, for plaintiff-appellant (Harold Harper and Arthur R. Gaetjens, New York City, on the brief).
 
 
 2
 John M. Friedman, New York City, for defendant-appellee.
 
 
 3
 Before HINCKS and MOORE, Circuit Judges, and BRENNAN, District Judge.*
 
 
 4
 BRENNAN, District Judge.
 
 
 5
 This appeal challenges the validity of a judgment of the District Court for the Southern District of New York which dismissed the claim of the trustee against The Peoples Bank of Haverstraw, hereinafter referred to as the "bank."
 
 
 6
 The complaint advanced ten separate claims against individual and corporate defendants. These claims, all arising out of the tangled background of the business affairs of the bankrupt, were tried to the court and money judgments were awarded against the Capitol Piece Dye Works, Inc., hereinafter referred to as "Capitol," and the individual defendants. The appeals taken from such judgments were withdrawn and we are not concerned therewith. The factual background applicable to the sole judgment under attack here will be briefly set forth.
 
 
 7
 The General Textile Processors, the bankrupt, was incorporated in New Jersey June 1, 1956. It came into being as the result of the amalgamation of seven corporations operating their separate plants in New York and New Jersey. These corporations were faced with financial loss in their separate businesses due to economic conditions in the business of finishing and dyeing of textiles in which they were engaged.
 
 
 8
 Capitol was one of the participating companies in forming the bankrupt as above. It operated a plant near Garnersville, N. Y. which was leased to the bankrupt in accordance with the agreement of amalgamation. Samuel Koenig was the president of Capitol and was also the treasurer and a director of the bankrupt.
 
 
 9
 On September 13, 1956, the bankrupt opened on account in the Peoples Bank of Haverstraw. The account was used primarily to meet the payroll of the Capitol plant. The arrangements for said account were made by Koenig who had been a valued customer of the bank for several years. Any one of four officers of the bankrupt, including Koenig, was authorized by a so-called signature card to sign checks drawn upon said account.
 
 
 10
 The business operations of the bankrupt were financially unsuccessful. The chronological history pertinent here may be summarized as follows. On September 21, 1956, the bankrupt was insolvent; on November 2, 1956 it discontinued business; on November 5, 1956, an application for an equity receiver of the bankrupt was made to a New Jersey court; an order was filed appointing a receiver on November 7, 1956 and on the same day, an involuntary petition in bankruptcy was filed against the bankrupt in the United States District Court for New Jersey; on November 26, 1956, an order of adjudication was entered; on March 19, 1957, the plaintiff was appointed trustee.
 
 
 11
 The above facts afford a background for an understanding of the transactions which are the bases of the trustee's claim involved here, the circumstances of which are summarized below.
 
 
 12
 On November 5, 1956, the balance in the bankrupt's account in the bank was $10,660.81. On the morning of the above date, Koenig deposited in said account a check payable to the bankrupt in the amount of $9500. After ascertaining, through the assistance of bank personnel, that the check was good, Koenig then drew a check to his own order for the total balance in the account in the amount of $20,160.81. The check was immediately deposited in the bank in a new account entitled "S. Koenig, Special for Payroll." Koenig was the only person authorized to make withdrawals from said account. It was under his sole control. In the afternoon of the same day, Koenig submitted to the bankrupt his written resignation as treasurer.
 
 
 13
 Thereafter and intermittently from November 7, 1956 to November 26, 1956, checks drawn upon the bankrupt's account and signed by Koenig were presented to the bank. For the most part, they represented payroll payments for the employees at the Garnersville plant. Some of said checks were drawn prior to November 5, 1956 and signed in behalf of the bankrupt by S. Koenig. Those checks, drawn after that date, were signed in like manner. Upon presentation of such checks, the bank received the oral authorization of Koenig to pay same from the "S. Koenig, Special for Payroll" account. On November 26, 1956, prior to the time when the bank was informed that an adjudication had been made and a receiver had been appointed for the bankrupt, all of the funds in said account had been withdrawn with the exception of something less than $2.00.
 
 
 14
 The trustee's action appears to be based upon alternative contentions that the bank's action or inaction in the above transactions constitute a misapplication of the bankrupt's funds, a negligent and fraudulent transfer thereof and a breach of the bank's obligation to its depositor — all of which were put in issue in the trial court.
 
 
 15
 After taking evidence, which consisted in part of the oral testimony of Koenig and an officer of the bank who possessed knowledge of the facts relative to the transfer of the account and the subsequent handling thereof, the court made its decision which failed to make a specific finding as to wrongful conduct on the part of the bank as a basis of its liability.
 
 
 16
 The court found that the bank had no knowledge of the financial condition of the bankrupt during the crucial period involved. "It had no knowledge of bankruptcy, insolvency, the appointment of a receiver or financial failure." The obligation of the bank in the matter of the handling of corporate funds was briefly discussed. The court concluded that in any event no loss was sustained by the bankrupt corporation and therefore no liability followed. This conclusion is based upon an assumption rather than a finding that the bank breached its obligation to the bankrupt by permitting the transfer of November 5th.
 
 
 17
 Since the evidence is substantially undisputed, we are in as good a position as the trial court to make the necessary evaluation thereof as a basis for the decision of the questions posed. Orvis v. Higgins, 2 Cir., 180 F.2d 537.
 
 
 18
 A determination of the nature and effect of the transaction of November 5, 1956 is essential in this controversy. It is noted that the trial court did not find that the transfer of the account on the above day to "S. Koenig, Special for Payroll" amounted to a conversion thereof. The background of the transaction would seem to lend force to the conclusion that the transaction was one of form rather than of substance. Koenig knew that one of the officers of the bankrupt, who had authority to draw checks upon the bankrupt's account involved here, had withdrawn substantial sums of money from another of the bankrupt's bank accounts at Paterson, N. J. Koenig consulted his attorney as to what he could do, in the event of bankruptcy, to insure that the moneys in the appellee's bank could be protected so that employees would receive their pay. An excerpt from his testimony follows:
 
 
 19
 "He says, `They can attach the account right away and the people will not get their pay.'
 
 
 20
 "I says, `What can I do?' I says, `Can I withdraw that money to save it for the people?'
 
 
 21
 "He says, `Yes,' and he gave me the suggestion what to do."
 
 
 22
 Koenig further testifies without contradiction that he told the bank officer who attended to the details of the transaction that all payrolls as they usually come from the bankrupt should be paid from the new account. It is also noted that the action brought against Koenig was based upon his creation of illegal preferences in the matter of the funds involved here rather than a conversion thereof and that the new account was in fact used in payment of compensation to employees of the bankrupt. All of the above dictates a finding that the transaction of November 5, 1956 did not divest the bankrupt from the ownership of the funds in the bank at that time and the same constituted a change of name in the account rather than a transfer of the title thereto.
 
 
 23
 Upon the above finding, it follows that the ownership of the account remained in the bankrupt until November 7, 1956 when the petition in bankruptcy was filed and the bankrupt incurred no loss on account of the cashing of checks in the amount of $7,497.14, drawn prior to the filing of the petition in bankruptcy and presented to the bank between November 5, 1956 and November 7, 1956. Preference may have been made, but this action is not based upon such a claim and the bank is not liable therefor when it honors depositor's checks without notice of his insolvency. Cunningham v. Merchants Nat. Bk., 1 Cir., 4 F.2d 25, 41 A.L.R. 529.
 
 
 24
 The above holding does not dispose of the whole controversy but the problem becomes one of applying the pertinent provisions of the Bankruptcy Act.
 
 
 25
 Section 70 of the Act, 11 U.S.C.A. § 110, vests the trustee with the title to the bankrupt's assets as of the date of the filing of the petition, which would be November 7, 1956. It further provides that no transfer by or in behalf of the bankrupt shall thereafter be valid unless it comes within the protective provisions of the section. The trustee contends that the payment by the bank of the checks presented after the filing of the petition from the account constitutes an invalid transfer of the assets.
 
 
 26
 The bank invokes the provisions of Sections 70, sub. d(2) and (5) of the Act which it contends affords the bank protection from liability for the payment of checks aggregating $12,662.31 paid by the bank after November 7 and prior to any knowledge on the part of the bank as to the pending bankruptcy and also prior to the actual adjudication. We hold that the bank's reliance upon the above provisions is misplaced.
 
 
 27
 The applicable law requires no lengthy discussion. The history of the section involved, its interpretation and application are discussed in Lake v. N. Y. Life Ins. Co., 4 Cir., 218 F.2d 394. More recently, in Kohn v. Myers, 2 Cir., 266 F.2d 353, the policy of the statute is said to place an absolute ban upon all transfers not given specific protection under the Act. Good faith, absence of advantage to the transferor or non-depletion of the assets of the estate do not affect the effectiveness of the ban. We proceed to apply the law to the facts disclosed.
 
 
 28
 Koenig resigned as an officer of the corporation on November 5. He had no actual authority thereafter to sign checks payable from the bankrupt's funds. It may be argued that the bank had the right to rely upon the apparent authority of Koenig until it was notified by the bankrupt of his resignation as an officer. However that may be, the bank in making payments did not rely thereon but in each instance sought and acted upon the oral, individual and personal authorization of Koenig to charge the special account with the checks involved. It therefore cannot be said that the bankrupt's indebtedness, represented by such checks, was paid "upon his (the bankrupt's) order" as provided in Section 70, sub. d(2) and the transfers are not protected by the above provision.
 
 
 29
 Section 70, sub. d(5) is likewise unavailable to protect the involved transactions. The section in effect imposes the burden of proof as to the validity of transfers upon the party asserting same and provides that the negotiability of currency or negotiable instruments is not impaired by the provisions of the Act. The series of checks with which we are presently concerned had no valid inception since they lack the signature of an authorized officer. They are therefore "wholly inoperative" and confer no right upon the bank "to give a discharge therefor." N.Y.McKinney's Consol.Laws, Negotiable Instruments Law, C. 38, Sect. 42.
 
 
 30
 We conclude that the judgment appealed from must be reversed and the matter remanded to the District Court for the entry of a judgment for the trustee in the amount of $12,662.31 with interest from November 26, 1956 in accordance with this decision. We do not however pass upon the right of the bank to invoke any remedies which it may consider to be available to recover that portion of the funds, represented by the judgment to be entered, which have been used in the payment of the bankrupt's legitimate obligations.
 
 
 31
 Reversed and remanded with a direction.
 
 
 
 Notes:
 
 
 *
 Sitting by designation
 
 
 
 32
 HINCKS, Circuit Judge (concurring in part and dissenting in part).
 
 
 33
 I concur in the award to the Trustee of $12,662.31 with interest and the grounds on which the award is made.
 
 
 34
 I dissent from the holding that the Trustee is not entitled, in addition to the award as made, to recover with interest the sum of $7,497.14 representing the amount of checks presented to the Bank and paid by it between November 5 and November 7, 1956. I would hold that the transaction of November 5, 1956 was a transfer of a corporate bank account made by a corporate officer to himself individually without actual authority not in the due course of the Bank's business and under circumstances which put the Bank on inquiry as to the underlying authority for the transfer. In my opinion, the Bank was not absolved by § 95 of the Negotiable Instruments Law of New York which in express terms is applicable only when "such bank * * * have on file an authorization from said corporation showing that the said officer * * * is authorized on behalf of the corporation" to draw checks against the account of such corporation to himself as payee. Here, the only authorization on file was "to recognize * * * the signatures" of the four general officers of the corporation. This was not enough to satisfy the proviso, quoted above, to the exculpatory clause of said § 95. Commercial Trading Co. v. Trade Bank & Trust Co., 286 App.Div. 722, 146 N.Y.S. 2d 570.
 
 
 35
 LEONARD P. MOORE, Circuit Judge (dissenting).
 
 
 36
 Plaintiff, Trustee in Bankruptcy for General Textile Processors (General), is seeking to recover from defendant, The Peoples Bank of Haverstraw (the Bank), the funds which General had on deposit in Peoples. According to plaintiff, the funds had wrongfully been transferred by S. Koenig, an officer of General, from the General payroll account to an account labelled "S. Koenig Special for Payroll." After the transfer, payroll checks mostly drawn previously on the General account to the order of a number of General employees continued to be presented to the Bank. The General account having been closed, there were no funds therein. At the direction of Koenig, these checks were paid out of the newly created "S. Koenig Special for Payroll" account. The crucial dates are:
 
 
 37
 Sept. 21, 1956 General insolvent (unknown
 to the Bank).
 Nov. 5, 1956 General's account
 transferred by Koenig
 to "S. Koenig Special
 for Payroll."
 Nov. 5, 1956 Complaint for the appointment
 of receiver
 presented to New Jersey
 court (unknown to the
 Bank).
 Nov. 5, 1956 Koenig resigned as
 treasurer of General
 (unknown to the
 Bank).
 Nov. 7, 1956 Petition in Bankruptcy
 filed (unknown to
 the Bank).
 Nov. 7th
 through 26th,
 1956 Checks (some dated
 before November 5th,
 and some dated after)
 drawn against General's
 account, paid out
 of the "S. Koenig
 Special for Payroll"
 account. Special account
 reduced from
 $20,160.81 to $1.76.
 Nov. 26, 1956 The Bank notified of
 bankruptcy of General.
 
 
 38
 The court below held that even if the Bank breached its obligation to General by permitting the transfer, it would be liable only for the loss actually incurred by the corporation; and since the transferred funds were used for legitimate corporate obligations and since the payroll checks would have been paid out of the General account even if the transfer had not occurred, no such loss existed.
 
 
 39
 Discussion of the case on this hypothesis is unnecessary in view of the trial court's findings of fact. Although the findings are gleaned from the narrative opinion, they are nonetheless findings and the court made the approximate designation to that effect.
 
 
 40
 Under the law the Bank would be liable only if corporate funds were withdrawn by a corporate officer and used for his own purposes with actual or constructive knowledge by the Bank that this would occur. Bischoff v. Yorkville Bank, 218 N.Y. 106, 112 N.E. 759, L.R.A.1916F, 1059; Commercial Trading Co. v. Trade Bank & Trust Co., 286 App.Div. 722, 146 N.Y.S.2d 570; E. Moch Co. v. Security Bank of New York, 176 App.Div. 842, 163 N.Y.S. 277, affirmed 225 N.Y. 723, 122 N.E. 879. And then such liability would attach only for the amount of the loss.
 
 
 41
 The determinative facts must be those which bear upon "actual or constructive knowledge to the Bank." The court found that "the receiver never communicated with the Bank or attempted to take possession of the bankrupt's funds"; that the Bank "had no knowledge of bankruptcy, insolvency, the appointment of a receiver, or financial failure"; that the funds in the "S. Koenig Special for Payroll" account were used "for legitimate corporate obligations of the bankrupt"; and that "checks drawn against the Special Payroll account were checks of the bankrupt." As to loss, there was no proof that the funds had been "diverted from legitimate corporate purposes." The undisputed facts affirmatively established that the funds had been used for corporate purposes. "Any loss or damage which occurred was to other priority wage creditors because of the preference obtained by other creditors of the same class" but the Bank "is not liable for any loss which may have been suffered by creditors because of preferential payments made in satisfaction of legitimate corporate obligations."* [185 F.Supp. 438]
 
 
 42
 A reviewing court is thus met with the "clearly erroneous" rule. Even this rule scarcely applies because no different findings could have been supported. The majority finds a failure on the part of the trial court "to make a specific finding as to wrongful conduct on the part of the bank as a basis of its liability." Exactly how this could have been done by a court convinced that there was no wrongful conduct is not revealed. The majority opinion seems to recognize this in its own "finding that the transaction of November 5, 1956, did not divest the bankrupt from the ownership of the funds in the bank at that time and the same constituted a change of name in the account rather than a transfer of the title thereto." Therefore, the opinion holds that "ownership of the account remained in the bankrupt until November 7, 1956, when the petition in bankruptcy was filed." Attention, thus, must be focused on the legal situation as it existed on November 7, 1956. The account, according to the majority, was still in Capitol; S. Koenig, despite his resignation, so far as the Bank was concerned was still the Treasurer; and because no notice of bankruptcy had been received, the funds of Capitol were not under restraint. The same reason given by the majority for holding valid the checks paid before November 7th would apply equally well to the checks drawn thereafter but for the bankruptcy petition. However, the proof is unchallenged that the Bank had no notice of the petition.
 
 
 43
 Section 70, sub. d(2) of the Bankruptcy Act provides:
 
 
 44
 "(2) A person indebted to the bankrupt or holding property of the bankrupt may, if acting in good faith, pay such indebtedness or deliver such property, or any part thereof, to the bankrupt or upon his order, with the same effect as if the bankruptcy were not pending;"
 
 
 45
 To take this protection away from the Bank, the majority rely upon Koenig's resignation on November 5th, of which the Bank had no notice. This fact they avoid by the fact that the Bank acted on the "oral, individual and personal authorization of Koenig to charge the special account with the checks involved." The conclusion is that the checks were not paid "upon his (the bankrupt's) order" (Sec. 70, sub. d(2)). But this result is completely at variance with the majority's new finding that the transaction of November 5, 1956, did not divest the bankrupt of ownership. A relationship of debtor and creditor must, therefore, have continued and the "Special Account" theory has no factual support. Furthermore, the very same type of authorization used to justify the payment of the $7,497.14 applies equally to the $12,662.31.
 
 
 46
 The proposed judgment is also baffling because if the Bank may proceed to recover "that portion of the funds, represented by the judgment to be entered, which have been used in the payment of the bankrupt's legitimate obligations," why cannot the trial court on the remand determine as it has already done that all checks were honored for such purpose? What then becomes of the Trustee's judgment?
 
 
 47
 Upon the facts here presented, I believe the trial court's conclusion to be in conformity with the applicable principles of law and, hence, I would affirm.
 
 
 
 Notes:
 
 
 *
 Quotations from opinion below