## Granby Mining & Smelting Co., Appellant, *v.* Laverty et al.

*Banks and banking—Checks drawn by one partner in violation of agreement—Attachment execution.*

A partnership composed of two persons opened an account at a bank with an understanding that checks should be signed by both parties. In the partnership articles was a stipulation that checks should be signed by both partners, and this stipulation was communicated to the bank. Checks were so drawn down to within about four months of the dissolution of the firm. During these months a large number of checks were signed by only

one of the partners, and paid by the bank. On an attachment execution against the bank by a creditor of the firm, *Held* that if the checks signed by one partner only were not used for a legitimate partnership purpose, and were not applied to obligations legally binding upon the firm, the bank was liable to the extent of their amount to the attaching creditor.

Argued Nov. 7, 1893. Appeal, No. 267, Oct. T., 1893, by plaintiff, from judgment of C. P. No. 1, Allegheny Co., Dec. T., 1889, No. 605, on report of referee, in favor of Chas. E. Laverty et al., defendants, and the First Nat. Bank of Pittsburgh, garnishee. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Assumpsit and attachment execution. Garnishee pleads nulla bona.

By agreement of the parties the case was referred to Thomas Herriott, Esq., as referee, who found the facts as follows:

" The plaintiff in this case is a judgment creditor of Charles E. Laverty and John Scully, Jr., late partners doing business as the Manufacturers' Galvanizing Company, and the First National Bank is garnishee. The partnership between Messrs. Laverty and Scully was formed in the month of August, 1886, and their partnership agreement is in writing. The partnership was formed ' for the purpose,' as stated in said agreement, ' of engaging in and carrying on a general galvanizing and coppering business in said city of Pittsburgh.' The partnership agreement also provides, ' that they, viz., the said partners, shall jointly sign all checks, drafts, notes and other obligations which bind the copartnership.'

" The said Laverty and Scully engaged in business under said articles of copartnership, and carried on business for over two years. About February, 1889, the said partnership ceased to exist, and was practically dissolved, it having become insolvent and unable to pay its debts.

" About the time of the formation of said partnership, an account was opened up by it with the First National Bank of Pittsburgh, garnishee in this case, and during all the time the said partnership continued in business it kept its account with said bank. At the time of the opening of the account of said partnership with said bank, Charles E. Laverty, one of the partners, went to the banking house of said bank and showed

to the paying teller thereof a form of check, asking him to take notice how the firm's checks were signed. This check was signed by both the partners thus: 'Manufacturers' Galvanizing Company, Charles E. Laverty, Chairman, John Scully, Jr., Secretary and Treasurer,' and at this time the paying teller obtained Mr. Laverty's signature in the book of the bank wherein the signatures of its patrons are taken down for the purpose of identification.

" Shortly after opening of said bank account, the said partnership procured a lithographed form of check to be used in drawing upon its account with the said bank, which form was prepared for signature as follows:

" 'MANUFACTURERS' GALVANIZING CO.,

_____

*Chairman.*

_____

*Treasurer.'*

" This form was used in drawing checks upon the partnership account with said bank, both partners signing the same, and a large number of checks, amounting to several thousand in number, were drawn on said bank by said firm, signed by both partners in the manner provided by the form. Except in a few instances, all checks of the firm were drawn in this way, until the latter part of the year 1888, and the checks which had been drawn by one partner prior to this time were lifted, and checks, signed by both partners, were substituted therefor, or by the other partner signing the checks which had been originally paid upon the signature of but one partner.

" During this period, some checks drawn on the bank by one of the partners, to wit, John Scully, Jr., were brought to the attention of Mr. Laverty by the bank for the purpose of obtaining his signature also, the bank insisting upon having Mr. Laverty's signature, and refusing to pay the checks without it. From October 20, 1888, up until the time that the firm was dissolved, about February, 1889, a large number of checks were drawn upon the said bank by John Scully, Jr., alone. Some of these checks were drawn upon the lithographed form of check procured by the partnership, on which the blank for the signature of Mr. Laverty was left unfilled, but many were drawn on

the ordinary check blanks of the bank with no place prepared for signature of either chairman or secretary and treasurer.

" The number of the checks so drawn by John Scully, Jr., without the signature of his copartner, is one hundred and one, and their amount, in the aggregate, is $8,101.63.

" These checks were drawn without the knowledge or consent of Charles E. Laverty.

" The bank paid the same and charged them to the account of the partnership. Mr. Laverty did not discover that these checks had been drawn until after the bank rendered a statement of the firm's account, in which they were charged against the firm. Upon making this discovery, Mr. Laverty notified the bank that he refused to recognize these checks as binding upon the firm, and has ever since so refused to recognize them.

" The paying teller of the said bank, at various times, insisted upon the signatures of both members of the firm when checks signed by John Scully, Jr., alone, were presented by said John Scully, Jr., for payment. Thereupon the said John Scully, Jr., went to J. D. Scully, cashier of the bank, and father of said John Scully, Jr., and the said cashier thereupon directed said paying teller to ·pay said checks.

" Beside the one hundred and one checks so signed by John Scully, Jr., alone and paid by the bank, and charged against the firm's account, there were other checks signed in the same manner and paid by the bank, which the bank never charged against the firm's account, and which were lifted and made good by John D. Scully, cashier of the bank.

" During the period intervening between October 20, 1888, and the dissolution of the firm in February, 1889, John Scully, Jr., was also drawing checks upon said bank account in the regular manner, viz. : by obtaining his copartner's signature, and the number of checks thus signed about equals the number signed by Mr. Scully alone.

" While the articles of copartnership provided that all checks, drafts and notes shall be jointly signed, yet it was never the practice of the partners to jointly sign any drafts, and one partner always accepted drafts on the firm, and at least occasionally gave notes and checks of the firm.

" All of the one hundred and one checks, amounting to $8,101.63, except about $500, were drawn and went to pay

firm debts; in a number of cases the firm had deposited a draft in the bank and received credit therefor; the drawee refused to accept the draft, and John Scully, Jr., gave the firm check to lift this dishonored draft. Many of the checks were used to pay office expenses and the pay roll of the firm's employees; the balance, except about $500, was used to pay for material furnished the firm, or freight thereon, or other claims admitted to be firm debts. From October, 1888, until the partnership was dissolved, Mr. Laverty was absent from the city a considerable time, and even when in the city was not always at a place where his signature could be obtained. The bank book of the firm, balanced on March 30, 1889, shows a balance in favor of the firm of $22.68, but the bank lifted notes and other liabilities of the firm to an amount far exceeding this balance."

The referee reported that judgment should be entered in favor of the bank. Exceptions to the referee's report refusing to find requests for plaintiffs were overruled, and judgment entered in favor of the garnishee.

*Errors assigned* were in entering judgment for garnishee, and dismissal of exceptions, quoting them.

*Chas. M. Thorp* and *Geo. B. Gordon, John Dalzell* and *William Scott* with them, for appellant.—The general or implied powers arising out of the partnership relation may be limited or restricted by the partnership agreement, and such limitations or restrictions are binding on the partners themselves and upon those dealing with the partnership and having notice of any want of authority thereby created: 1 Lindley, Part. 167; Yeager v. Wallace, 57 Pa. 365; Bromley v. Elliot, 38 N. H. 303; Willis v. Dyson, 1 Starkie, 164; Gallway v. Matthews, 10 East, 264.

The unauthorized act of a partner does not bind the firm when the person dealing with him knows his lack of authority, even though the firm obtains the benefit of such act: 1 Lindley, Part. 189; Gallway v. Matthews, 10 East, 264; Emly v. Lye, 15 East, 7; Hawtayne v. Bourne, 7 M. & W. 595; Burmester v. Norris, 6 Ex. 796; Kingsbridge Co. v. Plymouth Co., 2 Ex. 718; Worcester Corn Exchange, 3 De G., M. & G. 180; Note to Chippendale Case, 4 De G., M. & G. 19.

That plaintiff is entitled to recover in this form of action is settled by Purdy v. Powers, 6 Pa. 492 ; Clarke v. R. R., 136 Pa. 415 ; Noyes v. R. R., 30 Conn. 1.

It is the duty of a referee to make findings on all matters before him and to answer all the points submitted. In each case there should be what is equivalent to a special verdict, which is a verdict by which all the facts are put on the record : Marr v. Marr, 103 Pa. 463 ; Sweigard v. Wilson, 106 Pa. 207 ; Harris v. Hay, 111 Pa. 562 ; Lewar v. Weaver, 121 Pa. 268.

It was the referee's duty to state separately and distinctly the facts found, the answers to any points submitted in writing by counsel and the conclusions of law : Act of April 22, 1874, P. L. 109 ; Foreman v. Hosler, 94 Pa. 418.

*C. C. Dickey*, *W. K. Shiras* with him, for appellee.—Unliquidated damages which depend upon the settlement of a partnership account cannot be attached : Knerr v. Hoffman, 65 Pa. 126.

The Supreme Court will not reverse a finding of fact by the referee, especially after it has been sustained by the court below upon hearing, under the act of 1889 : Lee v. Keys, 88 Pa. 175 ; City v. Linnard, 97 Pa. 242; Brown v. Dempsey, 95 Pa. 243 ; Bidwell v. Ry., 114 Pa. 535 ; Lucas v. Brockway, 45 Leg. Int. 331 ; Betz v. Delbert, 42 Leg. Int. 465 ; McCalmont v. Whitaker, 3 Rawle, 91 ; Finch v. Lamberton, 62 Pa. 370.

A bank is an institution of a quasi public character, whose business it is to receive depositors' money and pay it upon checks upon demand : Patterson v. Marine Bank, 130 Pa. 432.

The bank cannot be bound by agreement between the partners, and nothing short of an agreement on the part of the bank to pay only upon the signature of both partners, or an express notice that the firm will not be bound by the act of the partner, will render the bank liable : Lindley, Part. § 174; Vice v. Fleming, 1 Y. & J. 227 ; Hawken v. Bourne, 8 M. & W. 703; Brown v. Leonard, 2 Chit. 120 ; Greenwood's Case, 3 De G., M. & G. 476.

The relation between a bank and its depositor is that of debtor and creditor : Bank of Northern Liberties v. Jones, 42 Pa. 536 ; Bank of Republic v. Millard, 10 Wall. 152 ; Morse on Banks and Banking, § 29.

Payment to one of two partners after dissolution, and the

appointment of a third party to collect the debts and notice thereof to the debtor, was held good : Porter v. Taylor, 6 M. & S. 156.

OPINION BY MR. JUSTICE WILLIAMS, December 30, 1893 :

The plaintiff alleges that the bank, the garnishee, holds moneys belonging to its debtor, the firm doing business as the Galvanizing Company. This the bank denies. It admits that the firm was a depositor but asserts that the money so deposited has been paid out upon the checks of the firm. To this the attaching creditor replies that some of the checks charged to the firm account were really the individual checks of one partner and were not binding on the firm. This raised the question on which the case turned in the court below. The general rule undoubtedly is that the attaching creditor stands on no higher ground than his debtor. He acquires by virtue of his attachment no rights other than those his debtor possessed.

The determination of the question in this case requires therefore the adjustment of the account between the bank and its depositor. To facilitate such an adjustment the attaching creditor presented to the referee fifteen requests for findings of fact from the evidence before him. Ten of these were considered and the findings made substantially as requested. They showed the formation of a partnership between Laverty and Scully under the firm name of The Manufacturers Galvanizing Company, in August, 1886, and its dissolution in a state of insolvency in February, 1889. They showed that the articles of copartnership required that all checks and drafts should be signed by both parties ; and that to give effect to this stipulation a form of check for use by the firm was prepared and lithographed, having two lines for signatures, at the end of one of which the word " Chairman " was printed, and at the end of the other, the word " Treasurer."

It further appeared that this provision in the articles of partnership was communicated to the bank soon after, or at the time, the firm account was opened, and the form for executing checks by the firm entered on the signature book of the bank. The fact further appears that from the opening of the account in August, 1886, down to within about four months of the dissolution of the firm, the partners and the bank conformed to

the articles of partnership, and all checks were signed by both
parties in accordance with the lithographed form of check.   In
a few instances checks were paid bearing but one name, but
the other was added at the first opportunity, and at the request
of the bank, so that, of several thousands of checks drawn, all
bore the name of both partners until about four months before
the dissolution.   At that time Scully began to draw a series
of checks in addition to those bearing both names, which were
executed by himself only, for purposes and in transactions not
entered on the firm books, nor known to his partner.   These
checks were one hundred and one in number, and amounted to
eight thousand one hundred and one dollars and sixty-three
cents, and were repudiated by Laverty as soon as they came to
his knowledge.   In the remaining five requests for findings
the referee was asked to say that while these checks were be-
ing drawn by Scully he was carrying on business outside the
scope of the partnership, without the knowledge or consent of
his partner, not entered upon the firm books, which resulted
in losses, and caused the insolvency of the firm ; and that if
the bank had not paid the checks in controversy this losing
business could not have been carried on by Scully.

The referee was asked also to find and report to what part-
nership purpose, if any, these checks were applied.   The referee
was of opinion that these requests related to subjects that were
not material to the present controversy, and reported that he
" did not think it necessary to decide " upon them because they
were important only in " settlement of the equities between the
partners."   This may be so, but is by no means certain, un-
til the facts are found.   If, as between the bank and the part-
nership, the payment of these checks was unauthorized, then
the bank is not entitled to a credit for them as against the gar-
nishee.   It is very clear that the checks were drawn in violation
of the partnership agreement, and paid in utter disregard of
the notice to the bank and the mode of execution appearing on
the signature book.   The paying teller understood this and re-
fused payment of these checks.   He paid them only under the
direction of the cashier who was the father of John Scully, Jr.
Upon these facts the bank took the risk of their being drawn
for a legitimate partnership purpose, and is entitled to credit no
further than it is able to show that the money drawn upon them

was used in payment of obligations for which the firm was legally bound. For this reason the referee should have found, as requested, to what purpose the money drawn by Scully on checks signed by himself was actually applied, so that his general finding that the money was applied to partnership purposes might be examined in the light of the facts which led him to this conclusion. He should also have determined whether the business conducted by Scully without the knowledge of his partner was the business in which these checks or any portion of them was used, and if so whether the debts so contracted were binding on the firm. The mere fact that Scully behaved in bad faith towards his partner is unimportant.

The question to be determined between the plaintiff and the garnishee is whether the bank is entitled to credit for the checks drawn by Scully alone; and this, as we have seen, depends on whether these checks or their proceeds were applied to obligations legally binding on the firm.

The judgment is reversed and the record remitted that the further findings indicated above may be made.