[Civ. No. 25221.   Second Dist., Div. One.   Aug. 18, 1961.]

V OF I PRODUCTIONS, INC. (a Corporation), Appellant,
v. CALIFORNIA BANK (a Corporation), Respondent.

Jerome Weber and Bertram S. Harris for Appellant.

Swanwick, Donnelly & Proudfit and Donald O. Welton for Respondent.

WOOD, P. J.—This is an action to recover $35,100 from defendant bank upon the alleged basis that the bank, without authority, paid three checks, aggregating said amount, from plaintiff's account. In a nonjury trial judgment was for the defendant. Plaintiff appeals from the judgment.

Plaintiff was in the business of selling airplane transportation for tours to Honolulu. Harold N. Ravitch was president, and Herman P. DuBoff was assistant treasurer, of the plaintiff corporation. On December 16, 1958, plaintiff entered into a charter agreement with Overseas National Airways whereby Overseas would make six round-trip flights from Los Angeles to Honolulu, at the rate of $11,700 for each flight, and whereby the flights would be made between the dates of December 19 and December 31. Three of the flights were scheduled to be made on December 25.

On December 8 the plaintiff had opened an account at the defendant bank, Highland and Santa Monica Office. The signature card with reference to the account provided that two signatures were required in order to withdraw money, namely, the signatures of Harold N. Ravitch and Herman P. DuBoff. The money in the account on December 24, approximately $38,000, consisted principally of money which had been paid to plaintiff by persons who were to be passengers on the flights of December 25.

Arlene DuBoff, who is the daughter of Herman P. DuBoff (assistant treasurer of plaintiff), was office secretary for plaintiff. She kept all the records of incoming and outgoing money, did all the typewriting, filing, and general office work for the plaintiff corporation. She collected money from the passengers who were going on the tours, issued receipts for the money, and sent schedules and form letters to the passengers. She made most of the deposits at the bank. When Ravitch was absent, she was in charge of the office.

Ravitch went to New York on December 14 and stayed there approximately two weeks. While he was in New York, Arlene DuBoff was in plaintiff's office taking care of the business.

Mr. Rubino, vice-president of the bank (and manager of the Highland and Santa Monica Office), who had the checks transaction with plaintiff's representative Arlene on December 24 (as hereinafter referred to), had been acquainted with Ravitch and Arlene since September. Mr. Rubino had gone

on one of the tours to Honolulu in November; and in making his plans for the tour he had been in plaintiff's office, where he met Ravitch and Arlene. While he was in the office he observed that Arlene was busy handling the flights. She serviced his application for the flight. He saw her in the bank several times when she was depositing money for plaintiff.

George Dimitrovich, hereinafter referred to as one of the persons present at the checks transaction on December 24, was president of World Wide Travel Consultants, Inc., which organization acted as broker for Overseas National Airways in making the above-mentioned charter agreement with plaintiff. The Dimitrovich organization (World Wide Travel Consultants) had an account with defendant bank at the Canoga Park Office. Dimitrovich had been with Ravitch in New York about December 16 and 17.

Arlene testified that about December 20 she telephoned Ravitch in New York, and he told her that "the flights had to go or else," that she should not cancel anything, and that she should follow the instructions of Dimitrovich, who "would be in touch" with her; after that conversation and prior to December 24, Dimitrovich told her, by telephone, that it was impossible for the Overseas National Airways "to have three planes leave on the same day [December 25]," and that "we would have to reschedule them" for December 25, 26, and 27.

Arlene rescheduled the flights accordingly and sent telegrams to the 300 passengers notifying them of the change in schedule.

On the morning of December 24, Dimitrovich went to plaintiff's office and told Arlene that he had been with Ravitch in New York, and Ravitch had told him that the flights had to go and had to be paid for that day or "else they wouldn't leave." She "made out" or "typed" three checks for use in paying for the flights—each check was for $11,700, was payable to World Wide Travel Consultants (broker for the airline), and was drawn on the account of plaintiff at defendant bank. One of the checks was dated December 24, 1958, one was dated December 25, and one December 26. She telephoned her father, Herman P. DuBoff (who was authorized to sign checks), and told him that Dimitrovich (president of World Wide, the broker) was in the office, and that she had to have three checks for the flights or the flights "would not take off." He came to the office and signed the checks. She testified that she had attempted for several days "to reach" Ravitch

in order "to have him instruct the bank to pay these checks," but she could not reach him.

Later, on the morning of December 24, Arlene and Dimitrovich went to the Highland and Santa Monica Office of defendant bank, where Arlene asked Mr. Rubino (the bank manager) to certify the checks. She testified that she told him that the plaintiff (Voice of Israel Productions) had three flights scheduled to leave, that Ravitch was not in town, that the flights had to be paid for that day (December 24), and that she would have Ravitch sign the checks upon his return from New York. She testified further that Mr. Rubino "agreed to this"; she told Dimitrovich "to write on the back of each check exactly what it covered"; Dimitrovich wrote the information thereon; she told Mr. Rubino that Ravitch would want the checks paid, and that Ravitch would sign the checks as soon as he returned from New York. Mr. Rubino gave them three cashier's checks, each for $11,700 and payable to World Wide Travel Consultants.

Mr. Rubino testified that Arlene and Dimitrovich came into the bank on the morning of December 24; Arlene had three checks which were drawn against the Voice of Israel account (plaintiff's account), and she requested certification of the checks; she said, "If we don't get these checks certified these flights will not take off," and one flight was going on December 24th, one on the 25th, and one on the 26th; he replied that he could not certify the checks because the signature of Ravitch was not on them; she said Ravitch was in New York; he (witness) asked whether Ravitch could be reached; she replied that she did not know whether he could be reached at that time of day; she said Ravitch would be back on December 26 and he would be in the bank to sign the checks. Mr. Rubino testified further that instead of certifying the checks, and in order to keep possession of the checks for Ravitch's signature, he "issued cashier's checks to permit the flights to go"; that he told Arlene that since she wanted cashier's checks, that the two checks which were dated the 25th and the 26th would have to be made "the 24th"; she instructed him to change the dates to the 24th, and under her instructions and in her presence, he did so; he would not have issued the cashier's checks if he had not been under the definite impression that Ravitch would sign the V of I (Voice of Israel) checks when he returned. The cashier's checks were payable to World Wide Travel Consultants, Inc., were dated December 24, 1958— and each check was for $11,700.

Dimitrovich took the three cashier's checks and deposited them, on December 24, in the account of World Wide Travel Consultants, Inc., in the Canoga Park Branch of the California Bank. Dimitrovich advised the Overseas National Airways that he had received the cashier's checks. He testified that if he had not so advised that company, the flights would not have been made.

The flights were made as scheduled. There were approximately 100 passengers on each flight, and they had paid round-trip fares to Honolulu. The money which was paid for the fares was in plaintiff's bank account.

Ravitch did not go to the bank on December 26.

On December 28, when Dimitrovich was again in New York, he telephoned the Canoga Park Branch of the California Bank and requested the bank to wire $39,051 to the Overseas National Airways' bank account in the Chase-National Bank in New York; that payment was to cover payment of the three flights of December 24, 25, and 26 (and to cover an additional item). The bank complied with the request.

The cashier's checks were paid about December 29, 1958.

Ravitch testified that he did not know anything about the three V of I checks until January 2, 1959; he was aware that the flights were to be made on "these specific dates"; the flights had been cancelled by "C. A. B." because "the trips were not charterworthy"; about December 20 he called Arlene by telephone and told her to advise the passengers that they would not be going on these flights and that the money would be refunded upon his return to Los Angeles.

The court made findings which were to the effect that the representations made to defendant by plaintiff, acting through Arlene DuBoff, were in substance the representations stated in Arlene's testimony.

The court also found, among other things, as follows: In accordance with plaintiff's request, the defendant issued the cashier's checks and charged the amount to plaintiff's account. Ravitch had directed Arlene DuBoff to take all steps necessary to make certain such flights would be made. Dimitrovich, president of World Wide Travel Consultants, Inc., acquiesced in the representations made by Arlene to defendant. In reliance upon said representations, the defendant accepted the three checks, signed by Herman P. DuBoff and payable to World Wide Travel Consultants, Inc., and thereupon defendant issued to such payee the three cashier's

checks. The checks (of plaintiff) were paid on or about December 29, 1958, and long prior to any claim by plaintiff that the checks should not have been paid. Plaintiff had entered into a charter agreement with Overseas National Airways whereby Overseas agreed to make six round trip flights to Honolulu between December 19 and December 31, 1958, for $11,700 for each trip, which amount was payable prior to each flight. Flights were made on December 24, 25, and 26, 1958, and Overseas was paid for those flights from the proceeds of plaintiff's three checks—said moneys having been paid to World Wide as agent or broker for Overseas and having thereafter on December 30 been paid by World Wide to Overseas. Prior to the flights World Wide had informed Overseas that it had received payment for the flights. Each of the flights carried approximately 100 passengers, all of whom had paid for their passage. The $35,100 charged to plaintiff's account at defendant's bank on December 24, by reason of the payment of the three checks payable to World Wide and signed by Herman P. DuBoff, went to discharge a debt of plaintiff to Overseas.

As conclusions of law from the findings, the court stated as follows: Plaintiff suffered no damage by the action of defendant in paying the three checks of plaintiff without the signature of Ravitch and charging said amount to plaintiff's account with defendant bank. Plaintiff is estopped by its conduct from now contending that payment of its checks for $35,100 without the signature of Ravitch was not properly authorized.

Appellant (plaintiff) contends, in effect, that since there was only one signature on plaintiff's checks, and since the dates on two of the checks were altered, the defendant bank had no authority to act on behalf of plaintiff in paying the checks. The argument of appellant is to the effect that the bank, in issuing the cashier's checks, was accommodating third persons, namely, the broker for the airline and the airline; that the bank's assertion that the money discharged a legitimate obligation of plaintiff, and plaintiff was not damaged thereby, is not a valid defense; that the bank is erroneously applying equitable principles in this action for negligence in paying the checks; that plaintiff is not confronted with a case of doing equity, and no equity is involved herein; that the office girl who induced the bank to pay the checks was not the depositor, and there was no resolution of the plaintiff corporation on file with the bank authorizing her to

present the checks to the bank; and that it would appear that the bank merely loaned the money to her to pay a purported debt of plaintiff.

■■■■ As above stated, the court concluded that plaintiff was estopped by its conduct from contending that the payment of the checks was not authorized. There was evidence that Ravitch, who was in New York, had told Arlene that the flights had to go, that she should not cancel anything, and that she should follow the instructions of Dimitrovich, the broker for the airline. Dimitrovich had told Arlene that Ravitch had told him that the flights had to go and had to be paid for that day. One of the persons authorized to sign plaintiff's checks had signed the three checks involved here. Ravitch conceded (in his testimony) that, during his absence from plaintiff's office, Arlene was in charge of the office and she took care of the business. When she presented the checks (on December 24) to Mr. Rubino, the bank manager, she related to him the emergency situation that existed as a result of the absence of Ravitch, and the necessity for paying for the flights on that day; and she also told him that Ravitch would sign the checks when he returned on December 26. Mr. Rubino was acquainted with Ravitch and Arlene, and he knew that Arlene performed important duties in plaintiff's office with respect to the flights and that she had deposited plaintiff's money in the bank on several occasions. Plaintiff had made a contract with the airline whereby the airline had agreed to make the flights and plaintiff agreed to pay for them. The money in the bank consisted principally of money which the passengers had paid to plaintiff for the flights. Ravitch knew that the flights were scheduled for the specific dates referred to (December 24, 25, and 26) and he knew that approximately 300 persons had paid for their transportation and were planning to spend the Christmas holidays in Honolulu. He also knew that the contract price for each flight had to be paid before the flight was made. He remained absent from, and noncommunicative with, his office during the time when the final plans for the flights were being made by Arlene. The flights were made. According to Ravitch's testimony, he did not know anything about the plaintiff's checks (which were used to pay for the flights) until approximately a week after the flights had been made. It is apparent that the trial judge disbelieved his testimony as to when he knew about the checks, and disbelieved his testimony as to his telephone

conversation on December 20 telling Arlene that the government had cancelled the flights. The cashier's checks which were issued by the bank, in lieu of plaintiff's checks, were used to pay plaintiff's obligation under its agreement to pay the airline for the flights. It thus appears that plaintiff had the benefit of the payment which was made by the bank—which payment was made by reason of plaintiff's checks and the conduct of Ravitch, Herman DuBoff, and Arlene.

In American Juprisprudence, volume 7, at page 359, it is said: "Generally, by virtue of the implied contract arising from the usage of the banking business, a bank is entitled to demand some written evidence of an order of a depositor to pay out or transfer his deposit, and is not bound to act on an oral order. The usual method of withdrawing funds from a commercial bank or a commercial department of a bank is by check. . . . A bank may, however, if it so desires, waive its right to a written order and pay out a fund on deposit or transfer the deposit to the name of another on the oral order of the depositor."

In *Mathey* v. *Central National Bank,* 179 Kan. 291 [293 P.2d 1012], the above statement from American Jurisprudence was quoted, and thereafter it was said: "A verbal direction from the depositor to the bank to honor checks signed by another, or to pay a sum or transfer a credit, will fully justify the bank in so doing, and compliance with such direction relieves the bank from further liability to the depositor. If the bank itself is willing to act upon the verbal order, this would be a perfect defense to a suit by the depositor for the amount paid out under it. . . . Inasmuch as plaintiff gave the defendant bank authority to honor the checks drawn by her brother-in-law James Marston, and her husband Charles Mathey, and to have the same charged against her savings account, and the bank having complied with her request, she is estopped from recovering from the bank which obeyed her verbal order." In the present case, Ravitch did not give a verbal direction to the bank to pay the checks, but he left Arlene in charge of the office under such circumstances, with respect to the flights and the money in the bank, that his instructions to her, that the flights had to go and should not be cancelled, were tantamount to approving in advance actions on her part which reasonably would be required in order to make certain the flights would go.

It is to be noted further that the court made findings to

the effect that plaintiff was indebted to the airline in the amount which the bank paid and that said amount was received by the airline in payment of the debt.

In *Industrial Savings Bank* v. *People's Financial Service Corp.*, 296 F. 1006 [54 App.D.C. 259], a bank paid a check which was signed only by the treasurer of the corporation depositor, and the signature card provided that the checks should be signed by the president and treasurer. In an action by the depositor to recover the amount paid, the court said: "By paying the check a debt of the corporation was discharged; therefore it sustained no damage by the act of the bank in paying it. To support an action based on negligence there must be, not only the negligent act but a consequential injury, which is the gravamen of the charge. . . ."

In *Granby Min. & Smelting Co.* v. *Laverty*, 159 Pa. 287 [28 A. 207], the signature card of a partnership depositor at a bank required the signature of both partners. Some checks, bearing only one signature, were paid by the bank from the account. A creditor of the partnership attached the account and contended that the balance in the account should be increased by the amount of the checks which were paid when there was only one signature thereon. The court held that the bank was entitled to credit for the money paid on checks, signed only by one partner, to the extent the bank could show that the money paid thereon was used to pay partnership obligations.

In *Feldman* v. *Capitol Piece Dye Works, Inc.*, 185 F.Supp. 426, a trustee of a bankrupt corporation sought to recover from a bank money which the bank had permitted to be transferred from the account of the corporation to the individual account of the treasurer of the corporation. It was held that the bank was not liable, because the money was used to pay a part of the payroll of the corporation. The court said: "However, the Bank's obligation is for *loss* suffered by the corporation and there is no liability in the absence of loss."

In the present case the evidence as to the conduct of Ravitch, Herman DuBoff, and Arlene, and as to discharging plaintiff's debt, supports the findings (1) that plaintiff is estopped to assert that the bank was not authorized to pay the checks, and (2) that plaintiff was not damaged by such payment.

Likewise, appellant's argument that defendant's representative changed the dates of two checks without authority

is not sustainable. Arlene, who prepared the checks and was acting for the plaintiff under instructions above referred to, consented to the change of dates.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied September 11, 1961, and appellant's petition for a hearing by the Supreme Court was denied October 11, 1961.